**Vern KLINGBIEL, Plaintiff and Appellee,**

**v.**

**COMMERCIAL CREDIT CORPORA- TION, Inc., Defendant and Appellant.**

**No. 258–69.**

United States Court of Appeals, Tenth Circuit.

March 18, 1971.

William Bryan Miller, Kansas City, Mo., for appellee.

Irving Kuraner, Kansas City, Mo., Albert E. Grauberger, Kansas City, Kan., Darwin E. Johnson, Kansas City, Mo. (Kuraner, Oberlander, Lamkin & Dingman, Kansas City, Mo., of counsel), for appellant.

Before LEWIS, Chief Judge, and JOHN R. BROWN * and SETH, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

When Vern Klingbiel, (Purchaser), went outside his home in St. Louis, Missouri, on the morning of June 22, 1966 he found his brand new (1966) Ford Galaxie 500 gone. Later he was to learn that in the dark of night and with skillful stealth the car—despite its being fully locked—had been taken away, not by some modern auto rustler, but by an anonymous representative of the Automobile Recovery Bureau acting for Commercial,[1] the installment finance company, which was described with remarkable accuracy as a "professional firm". Little did he know that with this sudden, unexplained disappearance of an automobile, which—with all its chrome and large mortgage—was still his, so much had been unleashed. First, of course, was his anguish at his loss. More significant for us, time, tide, litigation, trial, victory and appeal was to instruct him in the intricacies of the fine print of the purchase mortgage contract he signed and, perhaps to his awe, the Uniform Commercial Code.

A Kansas jury, under the Judge's careful instructions, which we find to be unexceptionable, did not think much of this treatment and by its verdict awarded some small actual damages plus punitive damages in a sum almost twice the purchase price of the car.

Fleeing from this judgment as a matter of principle, if not principal, Commercial quite naturally and properly seeks a haven in the terms of the contract[2] and, as an anchor to wind-

---

* Chief Judge of the Fifth Circuit, sitting by designation.

1. Commercial Credit Corporation, Inc., a Kansas corporation.

2. For convenience of reference the bracketed numbers are inserted (e. g., [i] [a] [b] [c] etc.) :

   "This Mortgage may be assigned by Seller [Dealer], and when assigned, all rights of Seller shall vest in its assignee [Commercial] and this Mortgage shall be free from any claims or defenses whatsoever which Purchaser may have against Seller. * * * [i] If Purchaser [a] defaults on any obligation or breaches any agreement or warranty under this Mortgage, or [b] if Seller should feel itself or Vehicle insecure, [c] the unpaid portion of the Time Balance and any expense (including taxes) shall without notice, at the option of Seller, become due forthwith. [ii] Purchaser agrees in any such case [a] to pay said amount to Seller, upon demand, or [b] at the election of Seller, to deliver Vehicle to Seller. [iii] This Mortgage may be foreclosed [a] in any manner provided by law, or [b] Seller may, without notice or demand for performance or legal process, except such as may be required by law,

ward, the acceleration[3] and good faith[4] provisions of the Kansas Uniform Commercial Code. We find the attack unavailing and affirm.

### What Happened

The case was tried largely on stipulated facts. On May 26, 1966 Vern Klingbiel, a resident of St. Louis, Missouri, entered into an installment contract with Dealer[5] for the purchase of a new Ford Galaxie automobile. This installment contract showed a time sales price of $4,907.56. Purchaser made a down payment of $400.00, tendering to Dealer a personal check in the amount of $300.00 and a second check in the amount of $100.00, the latter being signed in his wife's name. This left a time balance of $4,504.56, to be paid in 36 equal, successive monthly installments of $125.21, the payments to commence on June 26, 1966, under the mortgage contract containing the acceleration and enforcement provisions (see note 2, *supra*). Commercial shortly became the assignee, on a dealer recourse basis, for the consideration of $3,400.00.

Subsequently, but before Purchaser's first monthly installment became due, Commercial felt itself insecure,[6] and it directed the Automobile Recovery Bureau of St. Louis, Missouri to repossess the automobile. On June 22, 1966—four days before Purchaser's first monthly installment was due and at a time when he was not in default—the repossessing professionals, without notice, demand, communication, or correspondence with Purchaser, removed his locked automobile from the front of his house in the dead of night, and delivered it to Commercial[7] along with Purchaser's personal property.[8]

---

lawfully enter any premises where Vehicle may be found, and take possession of it. [iv] Seller may retain all payments made by Purchaser as compensation for the use of the Vehicle while in Purchaser's possession. [v] Any personal property in Vehicle at the time of repossession which has not become a part thereof may be held temporarily by Seller for Purchaser, without liability therefor. * * * All rights and remedies hereunder are cumulative and not alternative."

3. "*84–1–208. Option to accelerate at will.* A term providing that one party or his successor in interest may accelerate payment of performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised." K.S.A. § 84–1–208.

4. "84–1–201(19) 'Good faith' means honesty in fact in the conduct or transaction concerned." K.S.A. § 84–1–201(19).

5. John North Ford, Inc., a Kansas corporation.

6. Commercial has gone into great depth to describe to this Court why it felt itself insecure. Without discussing this in any detail we assume that Commercial had a basis for "feeling insecure". As we point out, Commercial's insecurity goes merely to its right to accelerate the contract, not the procedures to be followed once the contract is accelerated.

7. Purchaser did not have the slightest idea that his car had been repossessed. He notified the police that it was missing, in the belief that it had been stolen, and it was the police who finally uncovered what had actually transpired.

Even the austere stipulation vividly portrays Commercial's conduct and presages its predicament:

"On June 22, 1966, Automobile Recovery Bureau, St. Louis, Missouri, at the telephone direction and request of Commercial Credit Corporation, without any notice, demand, communication or correspondence with plaintiff, some time during the night, took the locked 1966 Ford Galaxie automobile off the street in front of plaintiff's home, and delivered the car to Commercial Credit Corporation at St. Louis, Missouri. Commercial Credit Corporation had no communication either written or oral, with plaintiff prior to taking the automobile. Commercial Credit Corporation requested, ordered, authorized and directed the repossession of the 1966 Ford Galaxie 500 automobile from Vern Klingbiel because it felt itself, or vehicle, insecure."

8. The vehicle contained personal property valued at $120.00 which was never returned to Purchaser.

### Commercial's Contentions

Three sweeping contentions are made. First, the Trial Court erroneously instructed the jury to find for Purchaser on the illegality of the repossession. This was presented affirmatively and negatively by objections to the charge and refusal of a tendered instruction. Second, the Court erred in submitting to the jury the instruction on actual damages because (i) there was no evidence to support a verdict for actual damages, and (ii) it referred to actual, not market value. Third, the Court erred in submitting to the jury the issue of punitive damages because (i) none of the elements necessary for recovery of punitive damages were proved, and (ii) because the instruction was submitted under the law of Kansas rather than that of Missouri where the alleged wrong occurred.

### Out of the Verbal Wilderness

The skillful Trial Judge having been aware that this contract (see note 2, *supra*) was not written for those who run to read discerned its true meaning by recognizing its true sequential structure. Unlike Commercial which assumes that the right to accelerate without notice or demand is synonymous with the right to repossess without notice or demand, the Judge carefully distinguished between the two. Acceleration, he charged, was permissible without notice or demand. But upon acceleration Commercial then had to make demand or give notice to Purchaser so that the admitted failure of notice/demand (see note 7, *supra*) made Commercial's repossession an unlawful conversion.[9]

The Court's instruction tracked the terms of the contract correctly. Though under clause [i] [b] (note 2, *supra*)[10] "Time Balance" might from acceleration become due at any time without notice, if Commercial felt itself insecure, the very next provision in the contract provides "[ii] Purchaser agrees

in any such case [a] to pay said amount to Seller, *upon demand,* or, [b] at the election of Seller, to deliver vehicle to Seller." (Emphasis added). Clause [ii] [a] [b] with its alternative stated in the disjunctive does not speak in terms of rights which Commercial has. Rather it speaks in terms of *actions* which Purchaser must take depending on the choice opted by Commercial. It could require Purchaser to pay off in full or it could require redelivery. But before Purchaser was bound to do either Commercial had first to indicate which course was required. The two words, "upon demand", are not only conspicuous, they are unavoidable.

Not yet overborne, Commercial would further have us construe the contract so as to declare that no notice was necessary prior to repossession by falling back on clause [iii] [b] which provides: "[iii] This mortgage may be foreclosed [a] * * * or [b] Seller may, without notice or demand for performance or legal process, * * * lawfully enter any premises where Vehicle may be found, and take possession of it."

This is equally unavailing. At the outset, this clause follows—does not precede—but follows clause [ii] which, [a] [b] as we have held, calls for notice/demand before Purchaser is required to act upon a declared acceleration. Equally important, in the sequential structure of the contract this refers only to a *foreclosure.* This means that there must be a default on the part of the Purchaser. This can take the form of Purchaser's failure to perform as in [i] [a] or an acceleration under [i] [b]. Certainly in the case of predefault acceleration, as a result of the manner in which this contract is constructed, clause [ii] [b] in effect calls for notice/demand to precipitate a default. The failure or refusal of Purchaser after such notice/demand would, of course,

---

9. This was followed by a specific direction to find for Purchaser on liability and to assess the actual damages he suffered.

10. All references in brackets are to note 2, *supra.*

**1308**

be a [i] [a] default, thus setting in train the foreclosure provisions of [iii] [a] or [b], including *at that stage* even the most stealthy repossession by night riders.[11] But this privilege is not available by skipping from [i] [b] to [iii] [b] over the head of [ii] [a] [b].

◼ As a last ditch stand Commercial suggests that notice was not required because it had attempted to notify Purchaser on several occasions, each time in vain. This argument on this stipulated record is unimpressive. The contract called for notice/demand, not an effort toward it. This might, of course, be an element of "good faith" where relevant on damages, but not otherwise.

◼ Nor can Commercial make error out of refusal to give its requested charge (No. 1). Technically the charge was defective since its adaptation of Kansas Uniform Commercial Code §§ 84–1–208 and 84–1–201(19) notes 3, 4, *supra*, was tied into the introductory peremptory instructions that Commercial, upon good faith acceleration, "had the right to take possession * * * without previous notice or demand" for payment or redelivery. This, we have held, was wrong. Apart from this, as a submission on good faith, there was no harmful error. Section 84–1–208 refers expressly and exclusively to acceleration of the contract, not to the manner, means or timing of repossession.

With respect to the claim that the Court erred in failing to submit the good faith instruction under § 84–1–201(19), we find it incomprehensible, since the Court tendered Instruction No. 12,[12] in which "good faith" was defined exactly as Commercial would have had it stated in its proposed Instruction No. 1 (see note 4, *supra*). .·,

### Punitive Damages—Whose Law?

◼ Commercial contends the Court's application of Kansas law was incorrect because the alleged conversion occurred in Missouri. We find no error in the Court's application of Kansas law. See Vrooman v. Beech Aircraft Corp., 10 Cir., 1950, 183 F.2d 479; Roseberry v. Scott, 1926, 120 Kan. 576, 244 P. 1063; Cady v. Case, 1891, 45 Kan. 733, 26 P. 448. However, assuming without deciding, that the Court should have applied the law of Missouri, Commercial cannot show any harm. We are not here confronted with the classical situation where this Court must divine what a Kansas Court would think that a Missouri Court was thinking about a question on which a Missouri Court had not yet thought. Mutual of Omaha Insurance Company v. Russell, 10 Cir., 1968, 402 F.2d 339. The law of punitive damages in both Kansas and Missouri not only is well established, but it is virtually identical.

---

11. Of course clause [iii] [b] modifies this self-help "except such as may be required by law * * *." We intimate no opinion on the meaning or significance of this condition.

12. "INSTRUCTION NO. 12
   You are instructed that in this case the defendant, Commercial Credit Corporation, claims its repossession of the Ford Galaxie automobile was based upon its honest and good faith belief that its prospect of payment of the monetary obligation and performance of the terms of the security contract by the plaintiff was impaired, and upon its stated belief that it was acting in a legal manner under the terms of the instrument in repossessing said automobile.

You are instructed that in determining whether the conduct of the defendant company, as shown in the evidence before you, was such as to allow or justify punitive damages, you may take into consideration any evidence of good faith or honest belief in the legal merit of its course of conduct.
   You are further instructed that under the law of Kansas, namely, K.S.A. 84–1–101(19) [84–1–201(19)], ' "Good faith" means honesty in fact in the conduct or transaction concerned.'
   For the purpose of this instruction, the word 'impaired' means lessened or diminished."

### Kansas and Missouri Alike

■ There are nuances in wording, but upon distilling the cases through the retort of analysis the standard of each state encompasses the notion of acts done in reckless indifference to the rights of others. In Kansas it is well established that before punitive damages may be awarded there must be actual damages, and then a right to a recovery of them further proved. Watkins v. Layton, 1958, 182 Kan. 702, 324 P.2d 130; Stoner v. Wilson, 1934, 140 Kan. 383, 36 P.2d 999; Schumock v. Meerian, 1953, 175 Kan. 8, 259 P.2d 173. As we later discuss, this requirement was fulfilled by the jury finding in response to Instruction No. 8. Under Kansas law recovery of punitive damages—also called exemplary or vindictive—is permitted whenever the elements of fraud, malice, gross negligence, or oppression are mingled into the controversy, Wat-

kins v. Layton, *supra*; Malone v. Murphy, 1864, 2 Kan. 250; Wiley v. Keokuk, 1870, 6 Kan. 94; Cady v. Case, 1891, 45 Kan. 733, 26 P. 448, on the theory that the award of such damages is to punish the wrongdoer for malicious, vindictive, or wilful and wanton invasion of the injured party's rights, and to deter and restrain others from the commission of similar wrongs. Watkins v. Layton,.*supra*; Stalker v. Drake, 1913, 91 Kan. 142, 136 P. 912.

■ Missouri law, although expressed at times in terms of a wrongful act intentionally done with an awareness of its wrongful nature, and with a purpose to inflict harm, is not nearly that categorical. These are descriptives for the shorthand "legal malice" which can arise from acts done in reckless disregard of the rights of others.[13] This epitomizes the Kansas rule as well.

13. Missouri law with respect to punitive damages is fully set forth in Pashalian v. Big-4 Chevrolet Co., 1961, Mo.App., 348 S.W.2d 628, a suit in trover for conversion:

"'The policy of the law which authorizes the assessment of punitive damages in any case rests upon the idea that the wrongdoer deserves some punishment in addition to being required to make restitution, and to justify the award of such damages two things must occur: (1) The act complained of must be wrong and some actual damage result therefrom. (2) The wrongdoer must have known that his act was wrong, and he must have done it intending at the time to inflict injury thereby, or it must have been done under such circumstances that the law will imply the evil intent.'"
348 S.W.2d at 637.
Though proof of malice is required, there is no requirement that the aggrieved party prove the Defendant was actuated by personal ill will or spite toward him. "It is enough if there is evidence of legal malice, which according to legal definition, is the intentional doing of a wrongful act without just cause or excuse." 348 S.W.2d at 637. The law will imply an evil intent to inflict an injury from reckless disregard of another's rights and interests. Pashalian v. Big-4 Chevrolet Co., *supra*. See also, Summers v. Keller, 1911, 152 Mo.App. 626, 133 S.W.

1180; McNamara v. St. Louis Transit Co., 1904, 182 Mo. 676, 81 S.W. 880; Detmer v. Miller, 1949, Mo.App., 220 S.W.2d 739.
In Crull v. Gleb, 1964, Mo.App., 382 S.W.2d 17, the Court stated:
"In order for a plaintiff to recover punitive damages in Missouri, he must prove malice, either actual or legal. In actual malice, the action is motivated by hatred or ill will. Legal malice is the intentional doing of a wrongful act without just cause or excuse in reckless disregard of others." (Citing Pashalian, *supra*).
382 S.W.2d at 23.
"The chief purpose of punitive damages is punishment * * * and a deterrent to similar conduct by others." 382 S.W.2d at 23.
*Accord* Yost v. Household Finance Corporation, 1967, Mo.App., 422 S.W.2d 382; Bennett v. Tower Grove Bank, 1959, Mo.App., 325 S.W.2d 42.
Even under Missouri law Commercial's requested charge (No. 1) would not have been accepted by the Court. For example, in Duensing v. Huscher, 1968, Mo.App., 431 S.W.2d 169, 174, a Missouri court refused to give the instruction to the effect that if the jury found that the Defendant had acted in good faith and in the honest belief that the act was lawful, then the act was not malicious, so as to point exculpation from punitive damages.

The law does not require a specific finding of an "intentional and ruthless desire to injure", Watkins v. Layton, *supra*, 324 P.2d at 135, in order to sustain an award of punitive damages. "The burden of proof is sustained once the injured party shows such gross neglect of duty as to evince a reckless indifference of the rights of others on the part of the wrongdoer * * * [and] an entire want of care so as to raise the presumption that the person at fault is conscious of the probable consequences of his carelessness." *Id.*

The charge given correctly set forth this synthesized Kansas-Missouri law,[14] both as to the necessity for actual damages and the substantive standard of reckless disregard.[15]

■ We think there was evidence, if believed by the jury, to warrant the inference of more than simple inadvertence or a technical conversion. There was first the circumstance of the stealthy retaking without notice of any kind, although notice clearly was called for as we have held. At that time Purchaser was not in default.[16] Further, Purchaser's own personal property was taken along with the automobile. This was never returned to him, nor did he receive recompense for it. In fact, Commercial never even contacted Purchaser to inform him of the repossession. He had to find it out through his own effort and investigation. There are many other factors unnecessary to catalogue which sustain the punitive damage finding.

This leaves only the objection to the Court's instruction on actual damages (see notes 9, 15, *supra*). Clearly there was sufficient evidence to cover the three elements submitted by the Court for the loss of value of the automobile, Purchaser's personal property, and the loss of use of the vehicle for an intervening period.

■ The objection is pointed at the term "actual value" rather than market value of the car. Assuming, but not deciding that it was error, such error was harmless. The "actual" damages awarded totalled $770.00. Of this sum $120.00 was for the loss of Purchaser's personal property, which Commercial fully concedes is correct. Purchaser's testimonial estimate of the loss from the loss of use of the car, which clearly is a permissible element of damages, was approximately $500.00. Thus this leaves only $150.00 for the loss of value of the automobile itself. This modest recovery does not demonstrate any harm.

Affirmed.

14. "INSTRUCTION NO. 10

You are instructed that punitive damages, sometimes called exemplary or vindictive damages, are permitted whenever the elements of fraud, malice, gross negligence or oppression mingle in and are present in the controversy. Such damages are allowed, not because of any special merit in the injured party's case, but are imposed by way of punishing the wrongdoer for malicious, vindictive, or willful and wanton invasion of the party's rights; the purpose being to restrain and deter others from the commission of like wrongful acts. The law does not require a specific finding from the evidence of an intentional and ruthless design to injure another party in order to sustain an award of punitive damages. The burden of proof is sustained once the injured party shows such gross neglect of duty by the one complained of as doing the wrongful act as to evince or show a reckless indifference to the rights of others on the part of the wrongdoer.

The amount of such award of punitive damages is within the sound discretion of the jury as warranted by all the facts and circumstances appearing in the evidence, but may not exceed the amount of $20,000.00 claimed by the plaintiff."

15. The verdict form found specifically:
   Actual damages        $ 770.00
   Punitive damages    $7,500.00
This was a helpful use of a general verdict with interrogatories under F.R.Civ. P. 49(b). See Brown, Federal Special Verdicts: The Doubt Eliminator, in Proceedings of the Annual Judicial Conference, Tenth Judicial Circuit of the United States, 44 F.R.D. 245 at 338 (1967).

16. Whatever might have been his representations about the $100.00 check he signed on his wife's account, it was paid before the repossession.