557 F.2d 365
 The BANK OF NEW JERSEY, a corporation of the State of New Jersey
v.
BROKERS FINANCIAL CORPORATION (Defendant in D.C.) and
Northwestern National Insurance Company (Defendant
and third-party Plaintiff in D.C.),
v.
BROKERS FINANCIAL CORPORATION and Rocco J. Molinari and
Michael Grasso (third-party Defendants in D.C.).
Appeal of NORTHWESTERN NATIONAL INSURANCE COMPANY.
 No. 76-2069.
 United States Court of Appeals,
Third Circuit.
 Argued March 29, 1977.
Decided June 13, 1977.
 
 Melnik, Morgan, Weinberg & Weiner, Albert B. Melnik, Haddonfield, N. J., Jeffrey I. Kessler, for The Bank of New Jersey.
 John R. McConnell, Joseph H. Huston, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for Northwestern National Ins. Co.
 Before SEITZ, Chief Judge, and ALDISERT and HUNTER, Circuit Judges.
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 Northwestern National Insurance Company appeals from a grant of summary judgment against it in the District of New Jersey, holding Northwestern liable on a surety bond to the Bank of New Jersey. The appeal presents the question whether a creditor who has accepted a one-year surety bond as collateral for a five-year loan can use the impending expiration of the bond as grounds for accelerating the entire debt, in an attempt to force the surety to renew its bond. The court below held that the creditor had such power. For the reasons that follow, we reverse.
 
 I.
 
 2
 In February, 1971, the Bank of New Jersey agreed to lend $250,000 to Brokers Financial Corporation over five years, so that Brokers could complete construction of an apartment building in Ventnor, New Jersey. The indebtedness was evidenced by a one-year note at an interest rate of eight percent per annum. The note was renewable solely at borrower's option, so long as interest payments were made as agreed during the first year. There was to be no reduction of principal until the second year of the loan.
 
 
 3
 As collateral, the Bank required the assignment of a $550,000.00 second mortgage on the apartment building and a surety bond covering the first year of the loan in the full amount of $250,000.00. Brokers obtained the proposed form of a bond from Northwestern and forwarded it to the Bank on March 31, 1971. A covering letter requested the Bank to have the Bank's attorneys "complete this (bond) in a form acceptable to them . . . ."[1]
 
 
 4
 On April 7, 1971, Brokers executed and delivered to the Bank a note payable to the order of the Bank one year after date. The note reflected the agreement that only monthly interest was to be paid during the term of the note and included the borrower's option to renew if the interest was paid as agreed.[2] Also, the note contained an acceleration clause[3] of the sort permitted by N.J.Stat.Ann. § 12A:1-208.[4]
 
 
 5
 On April 16, 1971, Northwestern executed and delivered to the Bank the Financial Guarantee Bond in suit,[5] which originally had been transmitted to the bank with instructions to obtain approval of the bank's attorneys. Among its provisions were the following two, upon which this case turns:[6]
 
 
 6
 7. The term of this instrument is and shall be one year. If Principal exercises its right to renew the note, Surety's obligation hereunder shall not thereby automatically be renewed, but may be renewed at the option of Surety.
 
 
 7
 8. If, during the term of the note, Principal defaults in the payment of any monthly installments of interest, Obligee shall notify Surety forthwith, and Surety shall have ten days after receipt of such notice in which to cure the default and thereby preserve all of the Principal's rights which, in that event, shall remain in full force and effect.
 
 
 8
 Brokers faithfully made all interest payments through November, 1971. At that time, difficulties arose at the apartment complex, and interest payments ceased. Although Northwestern had not been notified of Brokers' failure to pay, the Bank, by letter of March 3, 1972,[7] notified Brokers of its intention to turn to the bond for payment:
 
 
 9
 Since there is now a default in the Note due to the nonpayment of interest from November 7, 1971, to March 7, 1972, in the amount of $6,622.09, we must under the terms of Paragraph 8 notify the "Surety" immediately and call for payment under the Bond. . . .
 
 
 10
 On March 8, 1972, the Bank apparently concerned about the value of the mortgage securing its five-year loan asked Brokers to obtain by March 14, 1972, an extension of Northwestern's surety bond.[8] This letter produced no results, and on March 15, 1972, counsel for the Bank notified Northwestern for the first time that "there has been a default in the payment of interest," recited verbatim the language of paragraph 8 of the bond, set forth above, and requested payment of the interest arrearages. On March 24, 1972, Northwestern paid the outstanding interest on the note, to and including that due for March, 1972, in fulfillment of its obligation under the bond and in preservation of all of Brokers' rights under the note.[9] At oral argument before this court, counsel agreed that this payment had cured any default.
 
 
 11
 Nevertheless, by letter dated April 5, 1972,[10] the Bank notified Brokers that "due to the default in the note . . ., we do not wish to extend the loan and are hereby demanding payment be made prior to 3:00 P.M. on Friday, April 7, 1972." Believing that all its rights under the note including the right to renew had been preserved by Northwestern's payment of the interest arrearages, Brokers tendered the April interest on April 6, 1972, and informed the Bank that it was renewing the note.[11] The Bank returned the tendered interest payment and repeated its refusal to extend the loan "due to the default in the note."[12]
 
 
 12
 Brokers refused to pay the full balance of the note, and the Bank on April 11, 1972, made demand upon Northwestern for payment of the principal sum plus interest from March 7, because the "principal sum had not been paid . . . ."[13] Northwestern also refused to pay, contending that there had been no uncured default that could have obligated it to pay on its bond.
 
 
 13
 On May 31, 1972, the Bank filed in the District of New Jersey a complaint, based on diversity of citizenship, against both Brokers and Northwestern. On July 17, 1972, default judgments were entered as to both defendants, but on July 20, 1972, the default was vacated as to Northwestern. The parties filed cross-motions for summary judgment, and on December 5, 1975, the district court granted the Bank's motion and denied Northwestern's.
 
 
 14
 The court found that the "default" in interest payments had been cured in accordance with the terms of the bond,[14] but it discovered another "default" that, it concluded, had triggered Northwestern's obligation to pay on its bond. The court observed that the note in question contained a typical acceleration clause: if the holder of the note deemed the total value of the collateral insufficient to secure the entire indebtedness, the holder could demand a reduction of indebtedness or the deposit of "additional collateral"; in default of those demands, the note would immediately become due. As the district court viewed the case,[15] the default in interest payments gave the Bank a substantial basis for believing its prospects for payment were impaired. The Bank then justifiably requested "additional collateral" in the form of an extension of Northwestern's bond, which was due to expire. When Brokers failed to produce this "additional collateral," said the district court, the note fell due in full under the acceleration clause; Brokers' subsequent refusal to pay amounted to a default for which the surety, Northwestern, was liable on its bond.
 
 
 15
 Northwestern appealed from the denial of its motion for summary judgment and the grant of summary judgment against it. Because we believe that the court below improperly interpreted the note's acceleration clause, we reverse.
 
 II.
 
 16
 Under the terms of the bond it executed and delivered to the Bank, Northwestern agreed to perform two duties: (1) to cure defaults in interest payments within ten days of notice from the Bank during the term of the bond (one year), and (2) to assume the risk of Brokers' default on the note occurring during the term of the bond (one year). It is undisputed that the default in interest payments was timely cured and forms no basis for holding Northwestern liable on its bond. The only question before us is whether the Bank's demand for an extension of Northwestern's bond was a demand for "additional collateral" within the meaning of the note's acceleration clause. Counsel have been unable to cite any cases on point. Unable to find a precedent, we must contrary to Dean Griswold's admonition make one.[16]
 
 
 17
 Undeniably, the Bank at no time prior to the institution of these proceedings acted as though its refusal to extend the term of the note was founded upon the acceleration clause. Indeed, every reference to "the default" in the correspondence cited above seems clearly to refer to the interest arrearages from November to March.[17]
 
 
 18
 Even apart from inquiries into what the parties "really" did, these facts simply cannot be stretched to fit the theory of the court below. There never came a time during the one-year term of the note when the collateral was insufficient to cover all the indebtedness; in fact, Northwestern's bond alone covered the full face amount of the note. The Bank's request for a new bond also in the amount of $250,000.00 to cover the second year of the note, demonstrates that the first-year collateral was sufficient. The Bank, then, was not requesting additional collateral to secure the indebtedness evidenced by the one-year note to which the bond referred.[18]
 
 
 19
 The Bank argues instead that, with the impending expiration of the one-year bond, the collateral was about to become insufficient. That was true, but not because the commercial value of the item constituting the collateral had diminished.[19] The risk of that diminution, in light of the acceleration clause, quite properly would have fallen upon the borrower. Instead, it was true because the item serving as collateral was, as the Bank had previously agreed, about to cease existing. In light of the Bank's initial contractual acquiescence in that impending quietus, it appears unfair to shift the burden of it entirely onto Brokers (and thus the surety) while the note was still fully secured (by virtue of surety's guarantee bond itself).
 
 
 20
 To allow the Bank to declare a default during the term of the bond, while the bond itself completely covered the full indebtedness, would be to convert the very act of executing a bond for a term shorter than that of the principal debt into a sufficient condition for the declaration of a default which triggers liability on the bond. For example, the Bank in this case bargained for and obtained what it thought was sufficient collateral in the form of a one-year bond. If the impending lapse of that bond after one year was itself the condition creating present insecurity (and hence default), then the express language limiting the bond to a term of one year and vesting the renewal option exclusively in the surety was meaningless; unless Northwestern extended the bond at the Bank's option, a default would occur. Thus, following the logic of the court below, sureties effectively would be precluded from executing guarantee bonds for a term shorter than that of the principal debt; refusal to extend for the future would simply lead to immediate insecurity and default, triggering liability on the bond.[20]
 
 
 21
 That seems an absurd result. If a bank considers a one-year bond too short for its own security, it can bargain with the borrower to pay the additional sum required to obtain a longer-term bond. But if the bank declares itself satisfied with a shorter-term bond, the surety is lured blindly into the snare: if the bank decides that expiration of the bond in the future will render the loan partially unsecured, the surety must provide regular extensions amounting to a longer-term bond, without gaining the additional consideration ordinarily asked for the longer-term bond. Otherwise, an immediate default will occur.[21]
 
 
 22
 Of course, the surety could protect itself by refusing to issue bonds for less than the full term of the principal debt and requiring the appropriate consideration. We cannot see the value, however, of creating such rigidity in the money market. The Bank here decided, as a matter of business judgment, that a one-year bond would be sufficient; it bargained for only a one-year bond, presumably making it less expensive for the borrower to obtain the loan. That flexibility would disappear if sureties were forced to execute, and charge for, only bonds covering the full term of the principal debt. Certainly there is no reason for the federal diversity courts to create that situation in an effort to protect lending institutions from the overreaching of surety companies.
 
 
 23
 Broad questions of the lender's right to accelerate because of prospective impairment are not before us. We hold only that the Bank's right to demand "additional collateral" cannot be understood to mean that the Bank could demand a "temporal extension of the same collateral," where the parties explicitly bargained for the expiration of the collateral the bond at a precise date within the term of the principal debt, and where that agreed-upon collateral currently covered the full indebtedness. The judgment of the district court will be reversed.
 
 
 24
 SEITZ, Chief Judge, dissenting.
 
 
 25
 The issue here is whether the debtor, Brokers Financial Corporation, defaulted on any obligations under its note to the Bank within the term of the Financial Guarantee Bond. The district court concluded that Brokers had failed to comply with a good faith timely demand for additional collateral, and that the Bank was therefore justified in calling the principal when Brokers defaulted on its obligation to so comply. The court found that Brokers' failure to pay interest from November 7, 1971 to March 7, 1972 was sufficient to "make a reasonable and honest creditor doubt the security of (the) loan beyond the first year." I see no basis for overturning this finding of fact. But while the finding is relevant, it is not a sufficient basis on which to conclude that Northwestern may be held liable on the Bond. The Bond and a $500,000 Second Mortgage on certain real estate, which the Bank also held, were clearly sufficient to secure all obligations which could be due during the first year of the note. Unless the note was to be renewed beyond the first year, the Bank had no reason to worry about the security of its obligations. Thus, the mere fact that the note might be renewed is not, in my view, sufficient to allow the Bank to make a good faith demand for additional collateral.
 
 
 26
 This, however, does not end the problem. The note was payable April 7, 1972, unless validly renewed. The Financial Guarantee Bond expired April 15, 1972. Thus, unless all obligations under the note were paid on April 7, 1972, or the note was validly renewed, the Bank could demand that Northwestern make good its obligations under the Bond.
 
 
 27
 The principal due under the note was never paid. Nor was the note validly renewed, though Brokers' attorney attempted to renew it. It is true that the note states that: "(a)lthough written for a period of 1 year, if interest is paid as agreed, this Note may be renewed." Moreover, the Bond states that: "(i)f, during the term of the note, Principal defaults in the payment of any monthly installment of interest, Obligee shall notify Surety forthwith, and Surety shall have ten days after receipt of such notice in which to cure the default and thereby preserve all of the Principal's rights which, in that event, shall remain in full force and effect." Thus, since Northwestern made good its obligation to tender the interest payments on which Brokers had defaulted, Brokers' default in paying interest did not preclude it altogether from renewing the note. Nonetheless, I conclude that Brokers was not entitled to renew the note, because it had failed to comply with the Bank's demand that it provide additional collateral[1] a demand which, as the district court found, was based on good faith uncertainty as to the Bank's security beyond the first year.
 
 
 28
 The note does not expressly give the Bank the right to condition renewal upon satisfaction of any good faith demands for additional collateral. But I believe that this right is inherent in the right to demand additional collateral: even if one should give Brokers the unqualified right to renew, the Bank would still have the option of immediately demanding additional collateral on the renewed note, and then calling all obligations due if this demand were not satisfied. Moreover, the course of dealings between the parties to the transaction shows that the Bank did demand additional collateral in connection with the renewal of the note. The Bank's letter dated March 8, 1972 to Rocco J. Molinari, President of Brokers, said that "at or prior to (March 14, 1972) you will present to us an extension of the Financial Guarantee Bond, Promissory Note of the Northwestern National Insurance Company . . ." The extension of the Bond must contemplate renewal of the note.
 
 
 29
 I do not understand the majority to question the proposition that the Bank could, in the proper circumstances, demand more collateral to secure obligations which had not yet matured. Rather, the majority stress that "(t)o allow the Bank to declare a default during the term of the bond, while the bond itself completely covered the full indebtedness, would be to convert the very act of executing a bond for a term shorter than that of the principal debt into a sufficient condition for the declaration of a default which triggers liability on the bond." I believe this conclusion to be in error. The Bank would have no right to demand additional collateral of Brokers unless it could do so in good faith. In my view, this requirement of good faith would not be satisfied if the sole basis for the demand were the impending expiration of the Financial Guarantee Bond. The present case, however, is different, since Brokers had failed to pay interest from November 7, 1971 to March 7, 1972.
 
 
 30
 While the result reached by the district court may seem harsh, I believe that it is correct because the Bond extends Northwestern's obligations as surety until April 15, 1972, and thus to any default in the payment of principal at the end of the first year of the note.
 
 
 31
 I would affirm the grant of summary judgment for the plaintiff.
 
 
 
 [1]
 Appendix at 46a
 
 
 [2]
 Id. at 31a
 
 
 [3]
 The acceleration clause provided as follows:
 (E)ach of the undersigned hereby agrees, whenever the total value of the collateral so held by the holder hereof, shall be insufficient in character, kind or amount in the holder's sole option and discretion to cover all indebtedness and liabilities as aforesaid of any of the undersigned to the holder hereof, with a margin added thereto satisfactory to the holder, to immediately reduce such indebtedness and liabilities or to deposit with the holder additional collateral to the satisfaction of the holder within two hours after demand made orally, or within twelve hours after demand made in writing addressed to the undersigned and delivered at any address shown on the records of the holder hereof, or within twenty-four hours after demand made by letter deposited in the United States mail with postage prepaid addressed to the undersigned at any address shown on the records of the holder hereof, or at the last known residence or place of business of the undersigned, and in default thereof this note shall forthwith without further demand or notice, and regardless of whether otherwise due by the terms hereof or not, become immediately due and payable.
 
 
 [4]
 Section 1-208, a codification of U.C.C. § 1-208, provides as follows:
 A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.
 
 
 [5]
 The full text of the bond is as follows:
 FINANCIAL GUARANTEE BOND PROMISSORY NOTE
 Date: April 16, 1971
 Bond No. NWN 1501
 TO: Bank of New Jersey
 TO: Broadway and Market Streets
 TO: Camden, New Jersey
 Gentlemen:
 We, Brokers Financial Corporation, a Pennsylvania corporation, hereinafter called the "Principal," and Northwestern National Insurance Company, a Wisconsin corporation, hereinafter called the "Surety," are held and firmly bound unto the Bank of New Jersey, a New Jersey corporation, hereinafter called the "Obligee," its successors and assigns, as their respective interest may appear, as obligees, in the sum of Two Hundred Fifty Thousand Dollars ($250,000.00), lawful money of the United States of America, for the payment of which Principal and Surety by this instrument jointly, severally, and firmly bind themselves, their successors and their assigns.
 Whereas, Obligee has agreed to lend to Principal the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) with the obligation to repay the loan to be evidenced by a certain negotiable promissory note (hereinafter "the note") in form and substance as set out in Exhibit A that is attached hereto and by this reference incorporated herein; and
 Whereas, Obligee desires protection, as its interests may appear, in the event that Principal defaults in the payment of the note;
 Now, therefore, the condition of this obligation is such that, if Principal shall well and truly perform all of the undertakings, terms, and agreements of the note, this obligation shall be null and void; otherwise it shall remain in full force and effect.
 Surety binds itself firmly and certainly unto Obligee to pay the indebtedness of Principal, evidenced by the note, within 30 days from receipt of notice of Obligee of default in the payment thereof.
 Surety further agrees that (a) any right of action which Obligee may have under this bond may be assigned to any person, firm, or corporation who or which becomes the bona fide holder in due course of the promissory note hereinabove described and (b) any such assignment will in no manner invalidate or qualify this instrument.
 The foregoing, however, is subject to the following further conditions and provisions:
 
 
 [1]
 The aggregate liability of Surety to Obligee, or to its successors or assigns, is limited to the sum above stated
 
 
 [2]
 If, by reason of partial payment of the note, Principal's obligation to Obligee is less than the sum above stated, the liability of Surety hereunder shall not exceed the obligation of Principal to Obligee
 
 
 [3]
 Upon making any payment hereunder, to the extent thereof Surety shall be subrogated to all rights or Surety's payee against Principal and/or any other person, firm, or corporation liable to that payee in connection with the default which is the subject of, or occasion for the payment. Further, upon making any payment hereunder, to the extent thereof Surety shall be entitled to an assignment of the note and the instruments of collateral referred to in paragraphs numbered 5 and 6 hereinunder
 
 
 [4]
 No suit, action, or proceeding shall be brought on this bond more than two years after maturity date of the note
 
 
 [5]
 The note and the payment thereof shall be secured by collateral to be assigned to and held by Principal, such collateral to be (a) a mortgage generally in form and substance as set out in Exhibit B that is attached hereto and by this reference incorporated herein and (b) a Bond and Warrant generally in form and substance as is set out in Exhibit C that is attached hereto and by this reference incorporated herein
 
 
 [6]
 In taking and securing the collateral referred to in the paragraph immediately next preceding, Obligee may employ whatever valid and effective means or instruments it chooses
 
 
 [7]
 The term of this instrument is and shall be one year. If Principal exercises its right to renew the note, Surety's obligation hereunder shall not thereby automatically be renewed, but may be renewed at the option of Surety
 
 
 [8]
 If, during the term of the note, Principal defaults in the payment of any monthly installment of interest, Obligee shall notify Surety forthwith, and Surety shall have ten days after receipt of such notice in which to cure the default and thereby preserve all of Principal's rights which, in that event, shall remain in full force and effect
 
 
 [9]
 Of the proceeds of the loan to be made by Obligee to Principal, as aforesaid, Two Hundred Twenty-five Thousand Dollars ($225,000.00) shall be expended for (a) labor and materials to be directly incorporated in the improvement of the real property described in Exhibit B hereof, (b) real estate taxes against that real property, and (c) interest owed on the first mortgage against that real property; and Obligee shall disburse the loan proceeds accordingly
 Signed and Sealed this 16th day of April, 1971.
 
 
 [6]
 Appendix at 35a-36a
 
 
 [7]
 Id. at 53a
 
 
 [8]
 Id. at 55a
 
 
 [9]
 Id. at 58a
 
 
 [10]
 Id. at 60a
 
 
 [11]
 Id. at 64a
 
 
 [12]
 Id. at 65a
 
 
 [13]
 Id. at 66a
 
 
 [14]
 Appendix at 77a. Appellee does not dispute that finding
 
 
 [15]
 On the record before us, there is no indication that this theory was even argued to the court
 
 
 [16]
 Griswold, The Judicial Process, 31 Fed.B.J. 309 (1972), reprinted in R. Aldisert, The Judicial Process 128, 129 (1976)
 Our research discloses that only a few cases have dealt with U.C.C. § 1-208, see note 4 supra, and none of those has involved the question presented here. See Jensen v. State Bank, 518 F.2d 1 (8th Cir. 1975) (good faith); Sheppard Fed. Credit Union v. Palmer, 408 F.2d 1369 (5th Cir. 1969) (same); Elevator, Inc., Duncombe v. State Bank, Iowa, 236 N.W.2d 674 (1975) (same); Van Horn v. Van De Wol, 6 Wash.App. 959, 497 P.2d 252 (1972) (same); Seay v. Davis, 246 Ark. 201, 438 S.W.2d 479 (1969) (same); Merchant v. Worley, 79 N.M. 771, 449 P.2d 787 (1969) (burden of proof); Fort Knox Nat'l Bank v. Gustafson, 385 S.W.2d 196 (Ky.1964) (same); Simon v. New Hampshire Sav. Bank, 112 N.H. 372, 296 A.2d 913 (1972) (coverage of demand instrument); Klingbiel v. Commercial Credit Corp., 439 F.2d 1303 (10th Cir. 1971) (provision of notice); Chrysler Credit Corp. v. Barnes, 126 Ga.App. 444, 191 S.E.2d 121 (1972) (same); Fay v. Marina, Inc., 6 UCC Rep.Serv. 516 (N.Y.Sup.Ct.1969) (coverage of "default" clause). For a general discussion of § 1-208, see Note, Acceleration Clauses in Sales and Secured Transactions: The Debtor's Burden Under Section 1-208 of the U.C.C., 11 B.C.Ind. & Com.L.Rev. 531 (1970).
 
 
 [17]
 The Bank was quite properly worried about the implications of the failure to pay the interest: cash flow problems at the apartment building lessened the value of the second mortgage given the Bank and impaired prospects for future repayment. But Northwestern's prompt payment eliminated those arrearages as a source of "default."
 
 
 [18]
 It is significant that the bond, as approved by the Bank, was expressly executed for a year, with option to renew vested solely in Northwestern. See paragraph 7 of the bond, supra at note 3
 
 
 [19]
 The mortgage can be omitted for purposes of analysis, since the risk of a decline in the value of a mortgage is always present. Moreover, the Bank's vice president in charge of the loan admitted that it was based on the bond rather than the mortgage, which did not cover the full face amount. Oral deposition of Robert N. Fitzgerald, Apr. 14, 1973, at 16
 
 
 [20]
 Thus, we cannot agree with the dissent's view that the bank's right to demand collateral automatically created a corresponding right in the bank to condition its acceptance of the borrower's renewal of the note upon renewal of the bond. The power to renew the note was lodged exclusively in the borrower, provided there was no uncured default and there was none. The power to renew the bond was lodged expressly in the surety. Those were the contractual terms for which the bank bargained. The dissent's creation of an implicit right in the bank to reject renewal of the note simultaneously creates in practical effect a right to compel renewal of the bond. There is no reason for this court to stretch plain contractual terms to protect a commercial institution from the consequences of its own bad bargain
 
 
 [21]
 Recognition that the bank can request additional collateral only in "good faith" does not, contrary to the dissent's suggestion, solve the surety's problem. Any time the bank as here extends a loan secured primarily by a bond shorter than the term of the loan, it will always have a good faith belief that, upon expiration of the bond, its collateral will be impaired. Yet the shorter bond is all the bank bargained for
 The dissent's error inheres in assuming that the bank must have a good faith belief that default is likely and, therefore, that the surety is protected against bank-imposed renewals in cases where the loan is safe. Even if that were a sufficient basis for judicial alteration of the bank's bad bargain and we think it is not it simply is not true. Under the acceleration clause, the bank need only have a good faith belief that its collateral is insufficient to cover the entire indebtedness. And as pointed out above, such a good faith belief will always arise in cases where the bank bargains for and extends a loan on the basis of a bond with a term shorter than that of the loan. Thus, the dissent's assertion that the good faith requirement cannot be met when premised solely on the expiration of the bond is simply at odds with the plain language of the acceleration clause. See note 3 supra.
 
 
 [1]
 I need not discuss the Bank's contention that there was no effective renewal of the note because Brokers never tendered a proper renewal note