**David D. CLAYTON, Plaintiff
and Respondent,**

v.

**CROSSROADS EQUIPMENT COMPANY,
Ivin Barlow, Les Barlow, Ralph H. Barlow and John Deere Company, Defendants and Appellants. (Two Cases).**

Nos. 17013, 17014.

Supreme Court of Utah.

Sept. 17, 1982.

Willard R. Bishop, Cedar City, J. Rand Hirschi, Dennis McCarthy, Salt Lake City, for defendants and appellants.

Michael W. Park, Cedar City, for plaintiff and respondent.

HOWE, Justice:

The plaintiff, David D. Clayton, brought this action against the defendants Crossroads Equipment Company (Crossroads) and John Deere Company (Deere)[1] seeking damages and possession of two John Deere combines which he alleged they wrongfully repossessed from him. The trial court, sitting without a jury, awarded the plaintiff $27,400 representing the amount he had paid on the combines, and $100 nominal damages for "unlawful detention." Plaintiff was also awarded $20,000 punitive damages against Deere. Crossroads and Deere were awarded the combines as their interest appeared, and Crossroads was awarded a set-off against the plaintiff in the amount of $1,413 and attorney's fees of $750 for money he owed to Crossroads on an open account. Defendants appeal.

On October 7, 1977 the plaintiff purchased a John Deere combine from Crossroads for $47,250. Plaintiff signed a contract marked "Retail Installment Contract, Security Agreement" which provided for a down payment of $18,900, an initial installment payment of $4,352 due on July 1, 1978, and equal payments of $3,793 every six months thereafter commencing January 1, 1979, until the balance was paid. Crossroads assigned this contract to Deere's branch office in Portland, Oregon for financing and it was accepted.

---

1. Defendants Barlow were dismissed from the action.

On May 15, 1978 plaintiff purchased a second combine on terms similar to those of the first purchase. The total purchase price was $54,470 minus a discount of $10,000. Plaintiff paid down $8,500 cash and gave a promissory note for $3,000 for the balance of the required down payment of $11,500. The first installment of $4,880 was due on July 1, 1978 and payments thereafter were to be made at six-month intervals. This contract was also submitted for assignment to Deere at Portland for financing but Deere refused to accept it.

Plaintiff used both combines to harvest crops for farmers. He traveled from state to state to work and had 14 years of experience as a contract harvester. In early August of 1978 he brought both combines back to Utah in search of harvesting work. He had hoped to harvest barley for Ivin Barlow, president of Crossroads. When plaintiff arrived in Utah, however, he discovered that Barlow's barley crop was overrun with weeds and was not yet ready for harvest.

Plaintiff then had the combines serviced by Crossroads together with some warranty work. On September 21, 1978 he commenced leaving with them intending to travel to Illinois where he had arranged to harvest corn. Crossroads had earlier informed the plaintiff that he could not take the second combine from the Crossroads lot since Deere had refused to accept the contract for financing which left the combine without insurance coverage. When Ivin Barlow discovered that the plaintiff had taken both combines and was leaving town he attempted to overtake him. On his way, he stopped to enlist the help of Deputy Sheriff Wayne Holt. When Deputy Holt and Barlow caught up with plaintiff, he had already been stopped by Barlow's son, Les. Les Barlow had observed the plaintiff leaving and had pulled his pickup across the path of the 1978 combine which was being driven by Bill Miles, an assistant of the plaintiff. After a roadside discussion between the men, the officer took temporary possession of the keys to the two trucks on which the combines were loaded. Later that day Deere requested Crossroads' assistance in further detaining the 1977 combine.

The two combines were moved to Crossroads' lot. Plaintiff did not pursue obtaining their possession at that time but later brought this action.

Plaintiff was awarded damages of $27,400 against both defendants plus punitive damages of $20,000 against Deere because of its improper repossession. He also recovered nominal damages of $100 for slander, false arrest, or "unlawful detention." Possession of the combines was given to the defendants. Crossroads was awarded a set-off of $1,413 which plaintiff owed to it on his open account, together with reasonable attorney's fees of $750.00 for collection services.

The broad issues which we consider material to the resolution of this appeal are:

1. Whether the "Retail Installment Contract, Security Agreement" executed pursuant to the purchase of the 1978 combine was in full force and effect on September 21, 1978, the date of repossession.

2. Whether the combines were wrongfully repossessed.

3. Whether the trial court's award of damages was proper.

4. Whether the trial court erred in awarding plaintiff punitive damages against Deere.

## I. THE 1978 CONTRACT

■ One of the defenses raised by the Answer of Crossroads was that at the time the contract for the purchase of the second combine was entered into in May 1978, it was orally agreed between the parties that the contract would not be carried by Crossroads but that the purchase would have to be financed by John Deere as was the first contract, or by someone else. Thus the contract was subject to either a condition precedent to its taking effect, or was subject to a condition subsequent which would terminate it if the parties were unable to find financing. The trial court made no finding on this issue although by implication it found that the contract was in effect when the repossessions took place in September 1978.

We find this defense to be meritorious. Both the plaintiff and Ivin Barlow testified that financing of the second contract was necessary and much of their testimony concerned the efforts of the parties to obtain financing. The contract was twice submitted to Deere's Portland branch office for acceptance for financing, but Deere refused to accept it. Contact was made with Borg-Warner for financing but without success. Plaintiff and Barlow even discussed the possibility of a lease arrangement between them. Finally, the matter culminated when the combines were in the shop of Crossroads in September 1978 for warranty work and servicing. It is uncontroverted that Barlow insisted that since financing had not been obtained, the combine should be left there in the possession of Crossroads, or that the plaintiff pay an additional $10,000 on the purchase price. Plaintiff admitted that on the morning of September 21, 1978 he spent several hours making telephone calls from Crossroads in an attempt to raise additional money to pay on the combine. It was only after he failed in that effort that he decided to take possession of the combine and transport it to Illinois where he claimed to have work awaiting him.

The parties had made efforts from May until September 21, 1978 to obtain financing. Since they had been entirely unsuccessful in obtaining it, Barlow had the legal right to take possession of the combine because the condition of financing had not been met. In view of the uncontroverted status of the evidence in this regard, the judgment against Crossroads must be reversed and the case remanded to the trial court for the purpose of amending the Findings of Fact accordingly, and for the purpose of the court making a determination of how much, if any, of the $8,500 which the plaintiff had paid on the machine should be returned to him.

## II. THE REPOSSESSION OF THE 1977 COMBINE

The next question presented is whether the 1977 combine was wrongfully repossessed. In the sales contract, there is a provision that:

> In the event of the default (as defined on the reverse side hereof), holder may take possession of the GOODS and exercise any other remedies provided by law.

The event of default with which we are here concerned is recited on the back of the agreement as follows:

> This note shall be in default ... if for any reason the holder of this note deems the debt or security unsafe, and in any such event the holder may immediately and without notice declare the entire balance of this note due and payable together with all expenses of collection by suit or otherwise, including reasonable attorney's fees.

■ The validity of such a contractual provision is not in dispute. Section 70A–1–208, U.C.A. (1953), provides that such provisions shall be construed to mean that the secured party shall have the power to exercise the remedies provided for "only if he in good faith believes that the prospect of payment or performance is impaired." The defendants could, therefore, accelerate the contract (note) and repossess the combine only in a *good faith belief* that the debt or their security was about to become impaired. See *State Bank of Lehi v. Woolsey,* Utah, 565 P.2d 413 (1977).

■ "Good faith" is defined by § 70A–1–201(19), U.C.A. (1953), as "honesty in the fact in the conduct or transaction concerned." The obvious purpose of requiring that a secured party act in good faith is to impose the basic obligation of fair dealing, and to protect the purchaser from the mere whim or caprice of the secured party. In the instant case the trial court found that no cause or reason existed on September 21, 1978, the date of the repossession, for Deere to feel any less secure than it did at the time the 1977 (first) contract was entered into between the parties. The court further found that nothing had occurred during the interim to make the plaintiff less credit worthy and concluded that Deere had acted in bad faith in repossessing the combine, particularly because the plaintiff was then current with his payments.

Deere assails this finding and conclusion primarily on the ground that when it investigated the plaintiff's credit at the time the second contract was submitted to it for acceptance of financing, it obtained information from its branch office in Dallas, Texas (where the plaintiff had formerly dealt) that he was a poor credit risk. The difficulty with Deere's position is that the record fails to establish that the transactions and events which formed the basis for the derogatory credit report from the Dallas office occurred after October 1977 when Deere accepted the first contract. Deere, without much investigation, had accepted the plaintiff as a credit risk on the 1977 contract. It would be highly inequitable to allow Deere to change its mind once it had accepted that contract simply because it subsequently conducted a more thorough investigation; it is unfair to put the buyer in default based upon information which was apparently available in one of Deere's own branch offices at the time that it had accepted plaintiff. Under pre-U.C.C. law, it was held that "insecurity" clauses contained in chattel mortgages and other security agreements were meant to apply to possible changes in conditions or circumstances, or new developments affecting the mortgagee's security. *Woods v. Gaar, S. & Co.*, 93 Mich. 143, 53 N.W. 14 (1892). Facts that would justify the mortgagee's taking possession "must arise from the acts of the parties or changes in values occurring subsequent to the execution of the mortgage." *Watson v. Cudney*, 144 Ill.App. 624, 627 (1908). See *Brook v. Bayless*, 6 Okl. 568, 52 P. 738 (1898); 69 Am.Jur.2d § 323 *Secured Transactions* (1973); Annot., 125 A.L.R. 314. Neither has Deere cited nor have we found any cases which have been decided under the U.C.C. on this point; but, no reason is apparent why the law should be any different now. See Annot. at 61 A.L.R.3d 244.

This is not a case where the plaintiff's credit had deteriorated after the contract had been accepted by Deere. On the contrary, the plaintiff had made all required payments to date on the 1977 combine. Furthermore, a representative of Deere had met in June 1978 with the plaintiff to collect an overdue payment which plaintiff made to him. He indicated to the plaintiff that he would use his effort to induce Deere to accept the second contract. We therefore affirm the trial court's finding that Deere failed to act in good faith, based upon its finding that there was no substantial change in his credit standing between the time of the execution of the 1977 sales agreement and the time the defendants repossessed the combine.

Deere further contends that it was justified in deeming the debt and security unsafe because the plaintiff had declared his intent to take the combine to Illinois. The contract provided that it would be kept in Riverside County, California. The U.C.C. financing statement had been filed only in that state. This contention is also unavailing. Deere's own witnesses contradicted each other as to whether plaintiff's announced intention to take the combine to Illinois was a factor in its determination to repossess the combine. John Hubbard, manager of financial services in the Portland office, testified that while he did not object to the machine being brought to Utah for warranty work, he did object to it being taken to Illinois and this was one factor in his decision to repossess it. D.D. Sommerfield, assistant to Hubbard, testified that Deere would have repossessed the combine irrespective of the events of September 21, 1978. A note which Sommerfield made following a telephone conversation with the plaintiff in June 1978 bears out that repossession was considered by him at that early date. Deere was obviously shaken by the adverse credit information it had received from its Dallas office and as Sommerfield admitted, it was foregone that Deere would have to repossess the 1977 combine, but he did not know just when it would take place. In view of this conflict in the testimony of Deere's own representatives and in view of all of the evidence, the trial court was not compelled to believe and to find that Deere exercised its repossession rights because the plaintiff announced his intention to take the combine to Illinois.

Moreover, the record establishes that Deere did not advance this as a reason at the time of the repossession. Les Barlow, who actually stopped the plaintiff from leaving, testified that Hubbard had telephoned him and told him that Deere had decided to repossess the combine pursuant to the "insecurity" provision and had called his attention to that provision in the printed form. Barlow then, apparently at Hubbard's request, pointed out this provision to the plaintiff as the basis for the detention of the combine. There was no evidence that the plaintiff was ever informed by Barlow or anyone else that Deere objected to the combine being taken out of the state. Had that reason been advanced by Deere or its agent, Barlow, Plaintiff would have had the opportunity to have taken the combine and returned to his home in Riverside County, California.

## III.  THE DAMAGES

■ Deere next complains that the trial court erred in awarding the plaintiff as damages the amounts he had paid on the combine. We find no error in this regard. In *Even Odds, Inc. v. Nielsen,* 22 Utah 2d 49, 448 P.2d 709 (1968) we stated that the desired objective in computing damages and fashioning a remedy is to evaluate a loss suffered by the most direct and practical method which could be employed. It appears that allowing Deere to retain the combine which it had earlier repossessed in addition to compensating the plaintiff for his investment in the combine, was the most direct method of providing relief to the plaintiff. In *Keller v. Deseret Mortuary Co.,* 23 Utah 2d 1, 455 P.2d 197 (1979) we held that a non-breaching party to a contract should receive an award which will put him in as good a position as he would have been in had there been no breach. That appears to be exactly what the trial court attempted to do. The combine had been repossessed by Deere and had been in its possession for several months at the time of trial. Allowing Deere to retain possession of the combine and compensating plaintiff for his investment therein was not an unreasonable method of fixing damages.

In fixing damages the trial court is vested with broad discretion and the award will not be set aside unless it is manifestly unjust or indicates that the trial court neglected pertinent elements, or was unduly influenced by prejudice or other extraneous circumstances. *Aerospace Realty v. Tooth, Ltd.,* Colo.App., 539 P.2d 1314 (1975).

It is true, as pointed out by Deere, that the plaintiff did not seek rescission of the contract in his complaint but sought damages for loss of use both in his complaint and at trial. However, Deere has not shown how it was prejudiced by the trial court's action in adopting a different measure of damages. Plaintiff testified that based on past experience, he could have earned approximately $43,000 after expenses with the two combines for the harvesting which he had already contracted for in the fall of 1978. He was, of course, unable to perform the harvesting after the repossession. Had the trial court compensated him for the loss of use, of one combine, the amount of the award could have been, based upon plaintiff's testimony, in excess of the $18,900 which the trial court awarded him on the rescission and restitution theory.

(Two justices have dissented to this part of the opinion, but a 2 to 2 vote works an affirmance of the trial court.)

## IV.  THE PUNITIVE DAMAGES

Deere contends there is no basis in the evidence for the award by the trial court of $20,000 punitive damages against it. Deere assails that court's findings that it (1) conceived a scheme to extract from the plaintiff as much money as possible and to then repossess the combine, and (2) that Ivin Barlow enticed the plaintiff to come to Utah and bring his machines upon a false promise that he had crops to harvest. Without discussing these points in detail, if we assume the validity of Deere's argument, there is other competent evidence which amply supports the award of punitive damages.

We have already concluded in Part II that there is evidence to sustain the trial court's finding that the repossession by Deere was not made in good faith. It should also be observed that the repossession came during the harvest season when the plaintiff had considerable work scheduled. The loss of the combine was more egregious at that time than it would have been at any other time of the year. The repossession, if allowed, would have probably resulted in the loss of plaintiff's equity. Section 70A–1–106, U.C.A. 1953 provides that punitive damages may not be had "except as specifically provided in this act or by other rule of law." It is well established in the jurisprudence of this state that punitive damages may be awarded when the proof supports a finding that the defendant's conduct was wilful or malicious. *Powers v. Taylor,* 14 Utah 2d 152, 379 P.2d 380 (1963); *First Security Bank of Utah v. J.B.J. Feedyards, Inc.,* Utah, 653 P.2d 591 (1982). Specifically, in a case involving the repossession of goods, the United States Court of Appeals for the 10th Circuit in *Klingbiel v. Commercial Credit Corp.,* 439 F.2d 1303 (1971) approved an award of punitive damages upon a showing by the plaintiff of "such gross neglect of duty as to evince a reckless indifference of the rights of others on the part of the wrong-doer, and an entire want of care so as to raise the presumption that the person at fault is conscious of the consequences of his carelessness" quoting from *Watkins v. Layton,* 182 Kan. 702, 324 P.2d 130 (1958). In *Klingbiel,* the defendant creditor had repossessed the plaintiff's automobile without notice which was required by the terms of the contract. An award of punitive damages was upheld. See the cases collected at 35 A.L.R.3d 1044 (1971) which the annotator states support the award of punitive damages where the repossession was under an ostensible claim of right, but the creditor acted with gross negligence, recklessness or oppressiveness. See also 69 Am.Jur.2d § 653 *Secured Transactions* (1973) to the same effect. In view of the trial court's finding of bad faith, and of all the evidence, we find no error in the award of punitive damages in the instant case. Cf. *Calhoun v. Universal Credit Co.,* 106 Utah 166, 146 P.2d 284 (1944) where we reversed an award of punitive damages in a repossession case, finding that the conversion was not made in bad faith.

The judgment below is affirmed except as modified herein and the case is remanded for further proceedings consistent with this opinion. Each party shall bear his or its own costs.

STEWART, J., concurs.

DURHAM, J., does not participate herein.

OAKS, Justice (concurring and dissenting):

I concur in Justice Howe's opinion, except for Part III, damages.

When Deere wrongfully repossessed the 1977 combine, the buyer was not in default. Consequently, the Uniform Commercial Code provisions regulating the rights of the parties upon the debtor's default are inapplicable.[1] The sole statutory provision applicable to the rights of a debtor who is not in default is § 70A–9–507(1), which is either inapplicable to the facts of this case or cumulative of the common-law remedy elected by the debtor.

In this case, the buyer (debtor) elected an action for wrongful repossession of goods sold under contract, an intentional tort which, if proven, would entitle the buyer to a tort measure of damages, including punitive damages. *First Security Bank of Utah v. JBJ Feedyards, Inc.,* Utah, 653 P.2d 591 (1982); 1 C.J.S. *Actions* § 47 (1936); 25 C.J.S. *Damages* § 120 (1966); 22 Am.Jur.2d *Damages* § 245 (1964). However, the compensatory relief awarded by the trial court

---

1. The secured property being located and the key actions having been taken in Utah, the law of this state governs the rights of the parties on default and for wrongful repossession. U.C.A., 1953, § 70A–1–105(1). Section 70A–9–103(3), which specifies the applicability of the law of the debtor's place of business, only applies to questions of the perfection of the security interest. § 70A–1–105(2).

and approved by Justice Howe's opinion in this case was comparable to the relief that would be given under the legal remedy of recision for a material breach of contract: Deere keeps the combine and the buyer recovers all of the amounts he has paid.

The trial court's broad discretion in fixing damages cannot justify the compensatory damages awarded in this case for three reasons: (1) A plaintiff cannot elect one theory or remedy in his complaint and proof at trial and then obtain relief only appropriate to another and inconsistent theory or remedy. 28 C.J.S. *Election of Remedies* § 3 (1941). *Cf. Cook v. Covey-Ballard Motor Co.,* 69 Utah 161, 169–70, 253 P. 196, 199 (1927). (2) Even the remedy of recision requires that the plaintiff's recovery be reduced for benefits received, in this case the reasonable value of the use of the combine during the time he possessed it. *Erisman v. Overman,* 11 Utah 2d 258, 262, 358 P.2d 85, 87 (1961). (3) Punitive damages are only recoverable for a "tortious invasion of the chattel holder's interest," *Annot.,* 35 A.L. R.3d 1016, 1025 (1971); authorities cited *supra,* and therefore cannot be an element of damages accompanying the contract remedy of recision for a mere breach of contract. *Reese v. Cradit,* 12 Ariz.App. 233, 236, 469 P.2d 467, 470 (1970).

I would therefore vacate the award of compensatory damages and remand with directions to redetermine plaintiff's damages on the existing record on the basis of the loss the plaintiff suffered from the wrongful action of Deere, with appropriate adjustment for the disposition of the collateral since it was repossessed. In the alternative, the award of punitive damages should be vacated and plaintiff's recovery as compensatory damages of the amounts he had paid should be reduced by the value of his possession of the combine.

HALL, C.J., concurs in the concurring and dissenting opinion of OAKS, J.

