No. 60,726

RILEY STATE BANK OF RILEY, *Appellee*, v. JAMES A. SPILLMAN and BEVERLY SPILLMAN d/b/a OLD TOWN COIN and GUN SHOP, *Appellants.*

(750 P.2d 1024)

Opinion filed February 19, 1988.

*Michael E. Riling,* of Riling, Norwood, Burkhead, Fairchild & Nitcher, Chartered, of Lawrence, argued the cause and was on the brief for appellants.

*Jeffrey W. Jones,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause and *Thomas L. Theis,* of the same firm, was with him on the brief for appellee.

The 'opinion of the court was delivered by

HERD, J.: This is a civil case by the Riley State Bank against James and Beverly Spillman for judgment on a note and to foreclose a security agreement. The Spillmans deny the allegations of the Bank's petition and counterclaim against the Bank for

unlawfully possessing their property and for conversion. The trial court bifurcated the case and granted summary judgment for the Bank on the issues raised in the counterclaim. The Spillmans appeal.

This dispute arose from the following facts: James Spillman and his former wife, Beverly, d/b/a the Old Town Coin and Gun Shop, had been commercial credit customers of the Riley State Bank of Riley since 1982. The Bank had made eight to ten loans to them during that time. On October 15, 1985, the Spillmans executed a renewal note for preexisting indebtedness to the Bank in the amount of $28,733.47. The payments were to begin on November 15, 1985, and continue on the 15th day of each month thereafter for 11 months, with a balloon of $25,077.93 due on October 15, 1986.

Incident to this loan, the Spillmans executed a security agreement in favor of the Bank which gave as collateral the following:

"All present and future inventory and stock in trade, all machinery, equipment, tools, fixtures* and supplies now owned or hereafter acquired; all present and future contract rights, accounts and notes receivable, and all as set forth on the attached Schedules 'A' and 'B', incorporated by reference herein, but not limited to.

. . . .

"* Fixtures used in the business operation of Old Town Coin & Gun Shop located at 532 South 17th Street, Old Town Mall, Manhattan, Kansas."

Schedules A and B listed the inventory of the shop, which was valued at $41,520. The Spillmans also executed financing statements to the same effect.

James Spillman claims he had been told by agents of the Bank it was the Bank's standard practice to allow a 10-day grace period to make a payment from the date the installment was due. Spillman said he had always relied on this understanding and had never been charged a late fee for any payments made within 10 days.

The Spillmans made their first payment on November 26, 1985, 11 days after the November 15 due date. The December payment was made on January 2, 1986, 16 days after the December 15 due date. These payments were accepted by the Bank without objection.

The Bank received no payment from the Spillmans on January

It deemed its loan insecure and the Spillmans in default and decided to seize the remaining collateral, having heard Spillman had made an unreported bulk sale from the inventory. The Bank did not notify the Spillmans, but called the wife of the Spillmans' landlord, Vern Osborne, and informed her of the Bank's intention to enter the premises for the purpose of repossessing the collateral. The Bank also contacted the Manhattan Police Department and informed it of its intentions.

Agents of the Bank visited the shop and found it closed. The agents could see through the windows of the shop that most of the expected inventory was gone. At 11:45 a.m. on January 25, 1986, a locksmith hired by the Bank opened the locked doors to the unoccupied shop and removed and replaced the locks. The burglar alarm was deactivated. No one was present during the entry to the shop except the agents of the Bank and there was, therefore, no objection to their actions by anyone.

Spillman returned to the shop on Monday, January 27, 1986, and found what had happened. He had still not tendered the January payment or proceeds from the bulk sales on the note and has not offered to make any further payments on the note.

Spillman claims the shop was closed for inventory purposes and because of personal problems involving the dissolution of his marriage. Spillman admits he made at least one large bulk sale of inventory in the early part of January. The sale was made without the Bank's consent. Spillman testified it had never been his past practice to give the Bank notice of sales during the five years in which he had operated his business and the Bank had never protested this practice. He said the inventory was no lower than it had been at times in the past.

The Bank accused Spillman of using the proceeds from the sale for his own personal use rather than to replenish inventory or make payments on his note. Spillman said he did not intend to use the money from the sale for his own personal use. He claimed had the Bank notified him it was going to accelerate the note he would have used the proceeds to make payment. He was hoping to purchase new inventory and use the proceeds from the sale of that inventory to pay the Bank within three to five days after he reopened the business. He said he only used the money for personal purposes when he was denied his livelihood by the Bank's actions.

Rather than removing the inventory from the Spillmans' business, the Bank kept the items in the store without selling them for over three months. The Bank did not pay any rent to the Osbornes and Spillman states he is thus liable, under the terms of his lease agreement, for the rent during the Bank's occupancy.

The Bank brought suit against the Spillmans, and sought to "foreclose its security interest" and gain a money judgment. The Spillmans counterclaimed and sought damages for conversion and interference with contract rights. The district court granted the Bank's motion for summary judgment on February 13, 1987, and recommended a K.S.A. 1987 Supp. 60-2102(b) appeal. The Court of Appeals denied the Spillmans' motion for an interlocutory appeal in an order filed March 9, 1987. On March 30, 1987, the district court ordered the inventory sold, but granted a stay of judgment for the amount still owing on the note pending the results of this appeal.

Summary judgment is proper when no genuine issue as to any material fact is found, despite a reading of the evidence which gives the benefit of all inferences which may be drawn from the admitted facts to the party against whom the judgment is sought. K.S.A. 1987 Supp. 60-256(c); *Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 238 Kan. 384, 390, 710 P.2d 1297 (1985). When summary judgment is challenged on appeal, the record is read in the light most favorable to the appellant. *McAlister v. Atlantic Richfield Co.*, 233 Kan. 252, 662 P.2d 1203 (1983).

The first issue is whether the Spillmans were in default at the time the Bank repossessed the collateral.

The statutory guidelines regarding default in Kansas are set out in part 5 of the Kansas Uniform Commercial Code—Secured Transactions. K.S.A. 84-9-501(1) gives the secured party, with certain exceptions, those rights and remedies provided by the security agreement.

The 1983 Kansas Comment to K.S.A. 84-9-501 notes:

"[T]he creditor is given great latitude in defining 'default' broadly in the security agreement; normally, the definition would include not only failure to pay an installment, but other events such as failure to insure the collateral, refusal to allow inspection of the collateral upon demand, failure to pay taxes or insurance, taking collateral outside the state or selling it without permission of the secured

party, death or insolvency of the debtor, failure of the debtor to make payments to other creditors, or whenever the secured party 'deems himself insecure.' See 84-1-208. The only limit is the creditor's subjective 'good faith.'"

The "Additional Provisions" of the security agreement signed by the Spillmans stated:

"Upon the happening of . . . (i) default in the payment . . . , the Secured Party at its option may declare all of the Obligations to be immediately due and payable and shall then have the remedies of a secured party under the Commercial Code, or other applicable law, including without limitation thereto, the right to take possession of the Collateral."

Although admitting they did not make the January payment on the due date, the Spillmans argue the security agreement was altered by the course of dealing between the parties in that the Bank told Spillman it had a standard practice of allowing a 10-day grace period and never objected or penalized the Spillmans for making a payment within that grace period.

The question thus before the court is whether a security agreement may be altered by the course of dealing between the parties. K.S.A. 84-1-205 states that:

"(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

. . . .

"(4) The expressed terms of an agreement and an applicable course of dealing . . . shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control . . . ."

Official UCC Comment 2 states:

"Course of dealing under subsection (1) is restricted, literally, to a sequence of conduct between the parties previous to the agreement. However, the provisions of the Act on course of performance make it clear that a sequence of conduct after or under the agreement may have equivalent meaning."

In *Byers Transp. Co. v. Fourth Nat. Bank & Trust Co., Wichita,* 333 F.2d 822 (10th Cir. 1964), a contract case, the court held the conduct of the parties changed the written contract provisions, but noted under Kansas law such modification of a written contract must be supported by consideration independent and separate from the original consideration supporting the contract. See *Augusta Medical Complex, Inc. v. Blue Cross,* 227 Kan. 469, 608 P.2d 890 (1980). The Spillmans make no claim to have given new consideration to support the modification of the terms of the written note.

The security agreement contained explicit limitations on the ability of the parties to modify its terms through a course of conduct. It stated: "No waiver by the Secured Party of any default shall be effective unless in writing nor operate as a waiver of any other default or of the same default on a future occasion." The clear meaning of the language is the Bank's lack of objection to late payments did not operate as a waiver, as there is not evidence such a waiver was given in writing, and the Bank's tolerance of late payments did not waive its right to claim a default in the future. Plain and unambiguous language must be interpreted according to its ordinary meaning. *Quenzer v. Quenzer*, 225 Kan. 83, 587 P.2d 880 (1978).

The clear meaning of the security agreement establishes the Bank did not waive its right to declare default upon late payment or failure to pay in the proceeds of the bulk sale. We hold the debtor was in default on his note; summary judgment on this issue was therefore proper.

The second issue is whether the Bank was required to give notice of default to the Spillmans before attempting to repossess the collateral. The Spillmans note that the security agreement, under the section on remedies in event of default, states that the Bank may *"declare* all of the Obligations to be immediately due and payable and shall *then* have the remedies of a secured party . . . including without limitation thereto, the right to take possession of the Collateral." (Emphasis supplied.) The Spillmans note the commonly used term "elect" was not used and argue the terms "declare" and "then" required the Bank to give notice before foreclosing. They point out there is no language in the security agreement which states the Bank may accelerate without notification.

The term "declare" is defined in Black's Law Dictionary 368 (5th ed. 1979), as "[t]o make known, manifest, or clear. To signify, to show in any manner either by words or acts." The Spillmans argue the definition required the Bank to make known to them their decision; the Bank argues the definition proves that "to act" was "to declare."

K.S.A. 84-9-503, which establishes the secured party's right to self-help repossession, makes no requirement of notice to the

debtor. The Bank therefore argues the lack of a specific statement that notification is not required only forces the conclusion that it retained its statutory right to repossess without notice. It argues a duty as onerous as a notice provision should not be imposed upon it by a problematic reading of two words in the agreement. It notes lack of intent for such a requirement to be imposed is evidenced by the lack of specifications in the agreement as to what type of declaration was required.

Under the limited circumstances of *Klingbiel v. Commercial Credit Corporation,* 439 F.2d 1303 (10th Cir. 1971), it was held the secured creditor must give notice or make demand upon the debtor before repossessing. The facts in *Klingbiel* differed from those in the instant case, however, in that the decision was based on a contradiction in terms of a contract which the court described as a "verbal wilderness." In *Klingbiel,* the creditor repossessed a car before the first monthly payment was due because it felt itself to be insecure. The contract clearly indicated it could accelerate the payment of the unpaid balance without notice if it felt insecure, but other terms required Klingbiel to pay the balance or deliver the car to the creditor only upon notice or demand.

We hold the Bank had no duty to give notice of default to the Spillmans before repossessing the security under the security agreement in this case.

The next issue is whether the Bank had a security interest in the lease of Spillmans' business. The Bank objects to the Spillmans' contention that it committed conversion of their leasehold interest when it seized the shop for three months and contends it had a security interest in the lease. The Spillmans object there was never any mention by the Bank of a desire to have a security interest in the lease.

Leases are specifically excluded from the scope of Article 9 of the Kansas Uniform Commercial Code under K.S.A. 84-9-104(j). The Official UCC Comment to that section states: "Except for fixtures . . . , the Article applies only to security interests in personal property." The Kansas Comment to section (j) states:

"Perhaps the most important exclusion in 84-9-104 is 'the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder.' To a large extent, the exemption in this subsection is a reflection of the general scope

provision in 84-9-102, that Article 9 only applies to security interests in personal property and fixtures."

It is thus clear the Bank did not have a security interest in the lease. The security agreement did not describe the leasehold interest as collateral. All security agreements must reasonably identify the collateral covered. K.S.A. 84-9-110. The Bank notes the description need not be specific and argues the description contained in the security agreement was plainly intended to be broad and all-inclusive in its scope. Such a broad reading of the description of collateral, however, violates the requirement that such collateral must be identified. See *Chanute Production Credit Assn. v. Weir Grain & Supply, Inc.,* 210 Kan. 181, 499 P.2d 517 (1972). A fair reading of the security agreement's description of collateral, with its careful inclusion of fixtures, requires a finding that the parties did not intend, at the time of the original transaction between the parties, to include the leasehold as collateral.

The Bank argues, however, that it has a valid security interest in the Spillmans' contract rights under their lease. In *Garnett State Savings Bank v. Tush,* 232 Kan. 447, 452, 657 P.2d 508 (1983), we rejected a creditor Bank's argument that it had a security interest in a real estate contract under the UCC, stating "K.S.A. 1981 Supp. 84-9-104(j) makes it clear that the UCC does not apply to interests in or liens upon real estate." Thus summary judgment was improper on this issue.

The next issue is whether the Bank committed a breach of peace by breaking the locks and disconnecting the Spillmans' burglar alarm.

The right to peaceful self-help repossession of collateral has a long history in the common law. The modern policy underlying the right is that if a creditor can effect repossession of collateral without resort to often expensive and time-consuming judicial procedures, debtors in general may more freely receive loans at a lower rate. The resultant freedom given creditors in repossession must be balanced with the need to avoid possibly violent confrontations between debtors and creditors. See generally *Benschoter v. First National Bank of Lawrence,* 218 Kan. 144, 152, 542 P.2d 1042 (1975); *Morris v. Bk. & Tr. Co.,* 21 Ohio St. 2d 25, 50 Ohio Op. 2d 47, 254 N.E.2d 683 (1970); White, *The Abolition*

*of Self-Help Repossession: The Poor Pay Even More,* 1973 Wis. L. Rev. 503.

K.S.A. 84-9-503 authorizes a secured creditor to perform self-help repossession after the debtor's default as long as it can be done without breach of the peace. The drafters of the UCC did not define the term "breach of the peace," purposefully leaving such definition to the courts. See White & Summers, Uniform Commercial Code § 26-6 (2d ed. 1980). White & Summers state that, to determine if a breach of the peace has occurred, courts focus their inquiry on whether the creditor entered the debtor's premises and whether the debtor or one acting on his behalf consented to the entry. Some courts have stated that a breach of the peace requires the use of either violence or the threat of violence. See, *e.g., Harris Truck & Trailer Sales v. Foote,* 58 Tenn. App. 710, 436 S.W.2d 460 (1968); see generally Annot., 30 A.L.R.3d 9, 75.

There has been little caselaw in Kansas on what constitutes a breach of peace; our definition of the term is thus largely incomplete. The leading case on the issue is *Benschoter v. First National Bank of Lawrence,* 218 Kan. 144.

The creditor in *Benschoter* entered the debtor's premises; the holding for the creditor focused on the debtor's consent to that entry. The debtor had received repeated warnings that the property might be repossessed and had finally told the creditor he could come get the collateral if he had not delivered it to the creditor that weekend. When the creditor did not receive the collateral over the weekend, an agent went to the debtor's farm. The debtor's 17-year-old son opened a padlocked gate protecting the collateral and helped the agents remove the property. 218 Kan. at 145-46. We held that alleged "stealth," in that the agent arrived at the farm when the parents were away, did not in itself constitute a breach of peace because of the debtor's prior consent.

In *Wade v. Ford Motor Credit Co.,* 8 Kan. App. 2d 737, 745, 668 P.2d 183 (1983), a consumer credit case, the Court of Appeals held consent of the debtor to repossession is not required. The court found no breach of peace where an agent of the creditor unlocked with his own key the debtor's car parked in the driveway and drove it away at 2:00 a.m., despite earlier threats from

the debtor she would shoot anyone attempting to repossess the car. The court held the lapse of time between the earlier threat and the repossession, and the unlikelihood the debtor would become aware of the repossession at 2:00 a.m., made the actions unlikely to produce violence.

Whether the breaking of locks by a creditor is per se a breach of the peace is a question which has not been decided by this court. There are cases in other jurisdictions supporting an answer on either side. Compare *Laurel Coal Co. v. Walter E. Heller & Co., Inc.,* 539 F. Supp. 1006 (W.D. Pa. 1982), with *Global v. Daley-Hodkin,* 105 Misc. 2d 517, 432 N.Y.S.2d 453 (1980). See generally White & Summers, Uniform Commercial Code § 26-6; Annot., 30 A.L.R.3d at 74.

The 1983 Kansas Comment to K.S.A. 84-9-503 states: "Forced entry into the debtor's premises would almost certainly be considered a breach of the peace." White & Summers agree most courts find unauthorized entry into a debtor's residence to be a breach of the peace, but entry into a business generally causes less concern. White & Summers, Uniform Commercial Code § 26-6; see *Cherno v. Bank of Babylon,* 54 Misc. 2d 277, 282 N.Y.S.2d 114 (1967), *aff'd* 288 N.Y.S.2d 862 (1968). However, we view breaking and entering either the residence or business of a person a serious act detrimental to any concept of orderly conduct of human affairs and a breach of the peaceful solution to a dispute.

We hold the Bank breached the peace by breaking the locks to the Spillmans' place of business. Thus, the repossession of collateral was illegal. A creditor must obtain possession of the collateral through the courts if entry to the debtor's premises, whether residential or commercial, can only be obtained through force. This holding renders moot the issue whether the Bank had the right, under K.S.A. 9-503, to change the locks and leave the collateral in the shop for a prolonged period of time.

The final issue is whether the Bank breached its duty to exercise good faith imposed by the Uniform Commercial Code. K.S.A. 84-1-203 imposes an obligation of good faith in the performance of each duty under the act. See *Wendling v. Puls,* 227 Kan. 780, 784, 610 P.2d 580 (1980). Good faith is defined under K.S.A. 1987 Supp. 84-1-201 (19) as "honesty in fact in the conduct or transaction concerned."

The Spillmans contend the Bank breached this duty by several means. It made no attempt to communicate with them before or after the repossession. Instead of removing the collateral, it changed the locks and left the collateral in the store for three months, forcing the Spillmans to incur three months of rent liability. During their ongoing relationship of over five years, there is no indication the Bank ever warned the Spillmans about the possible consequences of late payments. Instead, it accepted late payments and granted the Spillmans loan after loan. The Bank accepted the first two payments on the note presently before this court well beyond the 10-day grace period without comment.

We hold the Bank was operating in good faith in all its actions herein. The Spillmans were late in all their payments, had failed to obtain authority to make a bulk sale, and then failed to pay the proceeds thereof on the note, as required by the security agreement. The Bank's determinations it was insecure and that the Spillmans were in default were appropriate under the circumstances of this case.

The judgment of the trial court is affirmed in part and reversed in part and this case is remanded to the district court for further proceedings consistent with this opinion.