**Debbie S. DAVENPORT and Larry R. Davenport, Plaintiffs/Appellants,**

v.

**CHRYSLER CREDIT CORPORATION and P.L. Pentecost, Defendants/Appellees.**

Court of Appeals of Tennessee, Middle Section at Nashville.

May 1, 1991.

Permission to Appeal Denied by Supreme Court Sept. 23, 1991.

seeking statutory and punitive damages. The trial court, sitting without a jury, found that the repossession was proper and awarded the creditor a $6,774 deficiency judgment on its counterclaim. The debtors have appealed, asserting that the automobile should not have been repossessed and that the repossession was carried out improperly. We find that the repossession was carried out improperly and, therefore, reverse the judgment.

I.

Larry and Debbie Davenport purchased a new 1987 Chrysler LeBaron from Gary Mathews Motors on October 28, 1987. They obtained financing through Chrysler Credit Corporation ("Chrysler Credit") and signed a retail installment contract requiring them to make the first of sixty monthly payments on or before December 8, 1987.

The automobile developed mechanical problems before the Davenports could drive it off the dealer's lot. Even before their first payment was due, the Davenports had returned the automobile to the dealer seven times for repair. They were extremely dissatisfied and, after consulting a lawyer, decided to withhold their monthly payments until the matter was resolved.

Chrysler Credit sent the Davenports a standard delinquency notice when their first payment was ten days late. The Davenports did not respond to the notice, and on December 23, 1987, Chrysler Credit telephoned the Davenports to request payment. Mrs. Davenport recounted the problems with the automobile and told Chrysler Credit that she would consult her lawyer and "would let them know about the payment." After consulting the dealer, Chrysler Credit informed Mrs. Davenport that it would repossess the automobile if she did not make the payment.

Chrysler Credit telephoned the Davenports on December 30, 1987 because their first payment was three weeks late. Mr. Davenport told Chrysler Credit that he had turned the matter over to his lawyer and that he was not going to make the payment. Chrysler Credit telephoned

John J. Hestle, Clarksville, for plaintiffs/appellants.

Ellen Hobbs Lyle, Trabue, Sturdivant & DeWitt, Nashville, for defendants/appellees.

OPINION

KOCH, Judge.

This appeal stems from the repossession of a new automobile shortly after its purchase. The buyers filed an action in the Circuit Court for Montgomery County

again on January 7, 1988. On this occasion, Mrs. Davenport stated that their lawyer had instructed them to make the payment, and Chrysler Credit requested her to send the payment to its Brentwood office.

Chrysler Credit telephoned the Davenports one last time on January 13, 1988. It had still not received their first payment, and their second payment was five days past due. Mrs. Davenport insisted that she had mailed one payment[1] and added that she "was not responsible for the mail." Before hanging up abruptly, she also stated that she did not intend to make any more payments "on the advice of her attorney." At this point, Chrysler Credit determined that the Davenports were in default and requested American Lender Service Company to repossess the car.

Employees of American Lender Service arrived at the Davenports' home on the evening of January 14, 1988. They informed the Davenports that they were "two payments in default" and requested the automobile. The Davenports insisted that they were not in default and, after a telephone call to their lawyer, refused to turn over the automobile until Chrysler Credit obtained the "proper paperwork." The American Lender Service employees left without the car.

Before leaving for work the next morning, Mr. Davenport parked the automobile in their enclosed garage and chained its rear end to a post using a logging chain and two padlocks. He also closed the canvas flaps covering the entrance to the garage and secured the flaps with cinder blocks. When the Davenports returned from work, they discovered that someone had entered the garage, cut one of the padlocks, and removed the automobile.

American Lender Service informed Chrysler Credit on January 18, 1988 that it had repossessed the automobile. On the same day, Chrysler Credit notified the Davenports that they could redeem the car before it was offered for sale. The Davenports never responded to the notice. Instead of selling the automobile immediately, Chrysler Credit held it for more than a year because of the Davenports' allegations that the automobile was defective. In July, 1989, Chrysler Credit informed the Davenports that the automobile had been sold and requested payment of the $6,774 deficiency.

## II.

■ We need not tarry long with the Davenports' claim that Chrysler Credit had no basis to repossess the automobile or to accelerate their debt. We disagree. The proof supports the trial court's conclusion that Chrysler Credit had a legal right to initiate repossession procedures.

The Davenports were already two months delinquent when Chrysler Credit decided to repossess the automobile. In fact, they had not made a single payment since they bought the automobile despite Chrysler Credit's repeated requests. Even though Chrysler Credit had warned them of the risk of repossession, the Davenports steadfastly refused to make their monthly payments until their complaints about the automobile were resolved.

■ The Davenports' dissatisfaction with their automobile did not provide them with a basis to unilaterally refuse to honor their payment obligations in the retail installment contract. At the time the repossession took place, the Davenports had not requested rescission of the contract, attempted to revoke their acceptance of the automobile, pursued their remedies under the "lemon law,"[2] or taken any other formal steps to resolve their dispute with the dealer concerning the automobile. The Davenports' conduct gave Chrysler Credit an adequate basis to consider the loan to be in default and to decide to protect its collateral by repossessing the automobile.

---

1. Chrysler Credit received the Davenports' first payment on January 18, 1988 and the second payment on January 23, 1988. Even though the check for the second payment was dated January 8, 1988, its envelope was post-marked January 21, 1988.

2. *See* Tenn.Code Ann. §§ 55–24–201, –211 (1988).

## III.

We now consider whether the repossession of the Davenports' automobile was consistent with Tenn.Code Ann. § 47-9-503 (1979). The trial court determined that it was, relying on *Harris Truck & Trailer Sales v. Foote*, 58 Tenn.App. 710, 436 S.W.2d 460 (1968). We disagree, but only because *Harris Truck & Trailer Sales v. Foote* improperly restricts the scope of the protection Tenn.Code Ann. § 47-9-503 affords to buyers of consumer goods.

### A.

Tennessee has long recognized that secured parties have a legitimate interest in obtaining their collateral from a defaulting debtor. Prior to the Uniform Commercial Code, secured parties could repossess collateral either with or without the assistance of the courts. *Rice v. Lusky Furniture Co.*, 167 Tenn. 202, 205, 68 S.W.2d 107, 108 (1934). If they chose to proceed without judicial assistance, they were required to obtain the debtor's consent. *Nashville Auto Sales Co. v. Wright*, 26 Tenn.App. 326, 329, 171 S.W.2d 834, 835 (1943), and to proceed without a breach of the peace. *Morrison v. Galyon Sales Co.*, 16 Tenn. App. 394, 397, 64 S.W.2d 851, 853 (1932).

The General Assembly preserved the secured parties' self-help remedies when it enacted the Uniform Commercial Code in 1963.[3] It also preserved the requirement that repossessions must be accomplished without a breach of the peace. Tenn.Code Ann. § 47-9-503 states in this regard that "[i]n taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action."

### B.

Tennessee's version of the Uniform Commercial Code does not define "breach of the peace." Like the U.C.C.'s drafters, the General Assembly decided that this task should be left to the courts. *Riley State Bank v. Spillman*, 242 Kan. 696, 750 P.2d 1024, 1029 (1988); 2 J. White & R. Summers, *Uniform Commercial Code* § 27-6 (3d ed. 1988) (hereinafter "White & Summers"). Thus, it falls to us to determine what types of conduct the General Assembly intended to proscribe when it decided in 1963 that repossessions must be accomplished without a breach of the peace.

■ Our role in construing statutes is to ascertain legislative intent and then to carry it out. *Westinghouse Elec. Corp. v. King*, 678 S.W.2d 19, 23 (Tenn.1984), *cert. denied*, 470 U.S. 1075, 105 S.Ct. 1830, 85 L.Ed.2d 131 (1985); *Dorrier v. Dark*, 540 S.W.2d 658, 659 (Tenn.1976). As we go about our task, we must take care not to unduly restrict the statute's coverage or to expand it beyond its intended scope. *See United States v. Bacto-Unidisk*, 394 U.S. 784, 800-01, 89 S.Ct. 1410, 1419, 22 L.Ed.2d 726, *reh. denied*, 395 U.S. 954, 89 S.Ct. 2013, 23 L.Ed.2d 473 (1969).

The courts have many interpretational techniques available to them. We may conduct a textual analysis, giving the words in the statute their natural and ordinary meaning. *State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985). We may analyze the statute in light of other related statutes. *Westinghouse Elec. Corp. v. King*, 678 S.W.2d at 23; *Coleman v. Acuff*, 569 S.W.2d 459, 461 (Tenn.1978). We may also analyze a statute in light of earlier judicial interpretations of the statute itself or similar statutes. *See Southeastern Aviation, Inc. v. Hurd*, 209 Tenn. 639, 655, 355 S.W.2d 436, 443 *app. dismissed*, 371 U.S. 21, 83 S.Ct. 120, 9 L.Ed.2d 96 (1962); *Willis & Turner v. Moore & Davis*, 151 Tenn. 562, 566-67, 271 S.W. 736, 737 (1924).

No one interpretational tool is inherently more preferable to the others. Thus, the courts should bring all applicable rules of construction to bear in order to elucidate a statute's meaning. *O.H. May Co. v. Anderson*, 156 Tenn. 216, 219, 300 S.W. 12, 14 (1927).

### C.

Any modern interpretation of the "breach of the peace" restriction in Tenn.

---

**3.** Act of March 15, 1963, ch. 82, § 1, Part 5, § 9-503, 1963 Tenn.Pub.Acts 243, 537.

Code Ann. § 47–9–503 must take into consideration (1) the Uniform Commercial Code's own rules of construction, (2) the Code's intent to adopt the common law where appropriate, and (3) this court's decision in *Harris Truck & Trailer Sales v. Foote*, 58 Tenn.App. 710, 436 S.W.2d 460 (1968).

■ The Uniform Commercial Code contains its own rules of construction. Tenn. Code Ann. § 47–1–102(2) (1979) provides that the

> [u]nderlying purposes and policies of chapters 1 through 9 of this title are:
> (a) to simplify, clarify and modernize the law governing commercial transactions;
> (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
> (c) to make uniform the law among the various jurisdictions.

We cannot achieve the Code's objective of uniformity by ignoring other jurisdictions' construction of uniform laws. *See Holiday Inns, Inc. v. Olsen*, 692 S.W.2d 850, 853 (Tenn.1985). While we should not blindly follow precedents from other jurisdictions, we should seriously consider them and should adopt them when they are harmonious with this State's public policy.

■ Statutes do not alter the common law any further than they expressly declare or necessarily require. *In re Deskins' Estates*, 214 Tenn. 608, 611, 381 S.W.2d 921, 922 (1964); *Linder v. Metropolitan Life Ins. Co.*, 148 Tenn. 236, 243–44, 255 S.W. 43, 45 (1923). Thus, courts will give statutory terms their well-recognized common law meaning as long as doing so is consistent with the remainder of the statute and is harmonious with its general purpose. *Lively v. American Zinc Co.*, 137 Tenn. 261, 273, 191 S.W. 975, 978 (1917).

Section 9–503 of the Uniform Commercial Code does not embody new rights or obligations. *Salisbury Livestock Co. v. Colorado Cent. Credit Union*, 793 P.2d 470, 473 (Wyo.1990). The Code's drafters used the phrase "breach of the peace" because they intended to codify the common

law's restrictions on self-help. *Northside Motors of Florida, Inc. v. Brinkley*, 282 So.2d 617, 622 (Fla.1973); *Messenger v. Sandy Motors, Inc.*, 121 N.J.Super. 1, 295 A.2d 402, 405–06 (1972); White & Summers § 27–6; 1A *Secured Transactions Under the Uniform Commercial Code* (MB) § 8.03[1][a] (1990); Special Project, *Self-Help: Extrajudicial Rights, Privileges and Remedies in Contemporary American Society*, 37 Vand.L.Rev. 845, 917 (1984).

There is a dearth of Tennessee authority concerning the meaning of "breach of the peace" as it appears in Tenn.Code Ann. § 47–9–503. The only reported case, decided over twenty years ago, involved the repossession of an unoccupied truck that the owner had left in a third-party's open parking lot. This court held:

> We think the legislative intent in the enactment of T.C.A. section 47–9–503, in using the words "if this can be done without breach of the peace", contemplated that the breach of the peace there referred to must involve some violence, or at least threat of violence.

*Harris Truck & Trailer Sales v. Foote*, 58 Tenn.App. at 718, 436 S.W.2d at 464.

We have determined that the *Harris* court improperly narrowed the scope of Tenn.Code Ann. § 47–9–503 by requiring that a repossession must be accompanied by violence or a threat of violence in order to be considered a breach of the peace. Its interpretation of "breach of the peace" is inconsistent with the common law and with the Supreme Court's earlier interpretations of the term.

### D.

■ The term "breach of the peace" is a generic term that includes all violations or potential violations of the public peace and order. *Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940); *Gray v. State*, 207 Tenn. 39, 43, 336 S.W.2d 22, 24 (1960); *State ex rel. Thompson v. Reichman*, 135 Tenn. 653, 667–69, 188 S.W. 225, 29 (1916) ("Reichman I"). It includes all unlawful acts and acts of public

indecorum that disturb or tend to disturb the public peace or good order. *State ex rel. Thompson v. Reichman,* 135 Tenn. 685, 700–01, 188 S.W. 597, 601 (1916) ("*Reichman II*"); *Galvin v. State,* 46 Tenn. (6 Cold.) 283, 294 (1869).

While breaches of the peace frequently involve offenses against individuals, they also include offenses against the public at large or the State. *Reichman II,* 135 Tenn. at 702, 188 S.W. at 602. The term "peace" means

> the tranquility enjoyed by citizens of a municipality or community where good order reigns among its members, or, that individual sense of security which every [person] feels so necessary to his [or her] comfort, and for which all governments are instituted.

*Reichman II,* 135 Tenn. at 701, 188 S.W. at 601. *See also Kimble v. Universal TV Rental, Inc.,* 65 Ohio Misc. 17, 417 N.E.2d 597, 602 (1980); *Jordon v. Citizens & Southern Nat'l Bank,* 278 S.C. 449, 298 S.E.2d 213, 214 (1982); 1 W. Blackstone, *Commentaries on the Laws of England* * 349 (Lewis ed. 1897); 4 C. Torcia, *Wharton's Criminal Law* § 521 (14th ed. 1981).

■ Offenses against individuals, generally criminal offenses, must be accompanied by violence or a threat of violence in order to be considered a breach of the peace. However, conduct that is "incompatible with the tranquility and good order which governments are organized to maintain" need not involve violence or a threat of violence in order to be considered a breach of the peace. *Reichman II,* 135 Tenn. at 702, 188 S.W. at 602.

■ We can find no support for the *Harris* court's decision to circumscribe Tenn.Code Ann. § 47–9–503 by limiting "breach of the peace" to its criminal context. The Code's drafters intended the term to have a broader meaning. *Deavers v. Standridge,* 144 Ga.App. 673, 242 S.E.2d 331, 333 (1978); *General Elec. Credit Corp. v. Timbrook,* 170 W.Va. 143, 291 S.E.2d 383, 384 (1982). Thus, neither violence, the threat of violence, nor personal confrontation is necessary in order for a

secured party's conduct to amount to a breach of the peace under Tenn.Code Ann. § 47–9–503. *Thompson v. Ford Motor Credit Co.,* 324 F.Supp. 108, 115 (D.S.C.1971) (violence not required); *Bloomquist v. First Nat'l Bank,* 378 N.W.2d 81, 86 (Minn.Ct.App.1986) (violence not required); *Hilliman v. Cobado,* 131 Misc.2d 206, 499 N.Y.S.2d 610, 614 (1986) (physical confrontation not required); *Ragde v. Peoples Bank,* 53 Wash.App. 173, 767 P.2d 949, 951 (1989) (physical confrontation not required); *Salisbury Livestock Co. v. Colorado Central Credit Union,* 793 P.2d at 470 (violence not required).

### E.

■ Secured parties may repossess their collateral at a reasonable time and in a reasonable manner. *See* Restatement (Second) of Torts § 183 (1976). Thus, determining whether a particular secured creditor's conduct amounts to a breach of the peace requires a review of the reasonableness of the secured party's conduct in light of the facts of the case.

Professors White and Summers have recommended that the inquiry should take into consideration (1) where the repossession took place, (2) the debtor's express or constructive consent, (3) the reactions of third parties, (4) the type of premises entered, and (5) the creditor's use of deception. *See* White & Summers § 27–6, at 575–76.

■ Public policy favors peaceful, nontrespassory repossessions when the secured party has a free right of entry. *Trevino v. Castellow Chevrolet–Oldsmobile, Inc.,* 680 S.W.2d 71, 74 (Tex.Ct.App.1984). However, forced entries onto the debtor's property or into the debtor's premises are viewed as seriously detrimental to the ordinary conduct of human affairs. *Riley State Bank v. Spillman,* 750 P.2d at 1030; *Girard v. Anderson,* 219 Iowa 142, 257 N.W. 400, 402–03 (1934). Accordingly, courts have consistently found that repossessions accomplished by breaking locks or cutting chains are inconsistent with the Uniform Commercial Code. *Laurel Coal Co. v. Walter E. Heller & Co.,* 539 F.Supp. 1006, 1007 (W.D.Penn.1982) (chain on fence

cut); *Henderson v. Security Nat'l Bank,* 72 Cal.App.3d 764, 140 Cal.Rptr. 388, 391 (1977) (garage door lock broken); *Riley State Bank v. Spillman,* 750 P.2d at 1030 (locksmith opened locked door); *General Elec. Credit Corp. v. Timbrook,* 291 S.E.2d at 385 (door lock on mobile home broken).

The courts have also disapproved of repossessions in which the secured party or its agent entered the debtor's closed premises without permission, *Oaklawn Bank v. Baldwin,* 289 Ark. 79, 709 S.W.2d 91, 92 (1986) (no entry through gates, doors or other barricades); *Raffa v. Dania Bank,* 321 So.2d 83, 85 (Fla.Dist.Ct.App.1975) (no entry into home or other closed building); *Bloomquist v. First Nat'l Bank,* 378 N.W.2d at 86 (entry through broken window), and repossessions causing damage to the debtor's property. *Ford Motor Credit Co. v. Herring,* 267 Ark. 201, 589 S.W.2d 584, 586 (1979); *Quest v. Barnett Bank,* 397 So.2d 1020, 1024 (Fla.Dist.Ct.App.1981). These decisions, and others like them, have prompted Professors White and Summers to observe that "a breach of the peace is almost certain to be found if the repossession is accompanied by the unauthorized entry into a closed or locked garage." *See* White & Summers § 27–6, at 577 n. 11.

### F.

Self-help procedures such as repossession are the product of a careful balancing of the interests of secured parties and debtors. On one hand, secured creditors have a legitimate interest in obtaining possession of collateral without resorting to expensive and sometimes cumbersome judicial procedures. On the other hand, debtors have a legitimate interest in being free from unwarranted invasions of their property and privacy interests. *Riley State Bank v. Spillman,* 750 P.2d at 1029; *General Elec. Credit Corp. v. Timbrook,* 291 S.E.2d at 385; *Salisbury Livestock Co. v. Colorado Central Credit Union,* 793 P.2d at 475.

Repossession is a harsh procedure and is, essentially, a delegation of the State's exclusive prerogative to resolve disputes.[4] Accordingly, the statutes governing the repossession of collateral should be construed in a way that prevents abuse and discourages illegal conduct which might otherwise go unchallenged because of the debtor's lack of knowledge of legally proper repossession techniques. *Steichen v. First Bank Grand,* 372 N.W.2d 768, 773 (Minn.Ct.App.1985).

American Lender Service's repossession of the Davenports' automobile was not accompanied by violence or the threat of violence because the Davenports were not at home at the time. However, Chrysler Credit and American Lender Service do not dispute that they obtained the automobile by entering a closed garage and by cutting a lock on a chain that would have prevented them from removing the automobile. Despite the absence of violence or physical confrontation, entering the closed garage and cutting the lock amounted to a breach of the peace. Thus, unlike the trial court, we find that the manner in which the Davenports' automobile was repossessed was inconsistent with the requirements Tenn.Code Ann. § 47–9–503 places on secured parties who are repossessing collateral from defaulting debtors.

### IV.

The question of damages remains since we have determined that the manner in which Chrysler Credit repossessed the Davenports' automobile was improper. The Davenports put on little proof of actual damage and have been unable to articulate an intelligible theory of recovery. Even so, they have demonstrated that they are entitled to the minimum statutory penalty authorized in Tenn.Code Ann. § 47–9–507(1) (1979).

### A.

The Davenports' lawsuit challenged Chrysler Credit's decision to consider them

---

**4.** *See Fuentes v. Shevin,* 407 U.S. 67, 93, 92 S.Ct. 1983, 2000–01, 32 L.Ed.2d 556 (1972); *Hilliman v. Cobado,* 499 N.Y.S.2d at 614.

in default and the manner in which American Lender Service repossessed their automobile. It did not take issue with the commercial reasonableness of Chrysler Credit's disposition of the automobile after it had been repossessed. These acts, according to the Davenports, entitled them to (1) "compensatory damages for the amount paid on the vehicle," (2) "damages for conversion as provided in T.C.A. 47–9–507(1)," (3) "[t]wenty [f]ive [t]housand [d]ollars in punitive damages, and (4) damages for injury to their credit reputation.

The Davenports' proof of damages is almost non-existent. While they proved that Chrysler Credit had accepted one of their payments, Chrysler Credit proved that it had credited this payment to their account. While they proved that they had been denied credit on other occasions, Chrysler Credit proved that the Davenports had a spotty credit history. They proved that American Lender Service cut a lock but neglected to prove the lock's value. They also proved that removing the automobile had caused some negligible cosmetic damage to their gravel driveway.

### B.

■ Secured parties who do not abide by Tenn.Code Ann. §§ 47–9–501, –507 (1979 & Supp.1990) expose themselves to a broad array of civil, and perhaps criminal, consequences. *See* White & Summers § 27–16, at 617. Tenn.Code Ann. § 47–9–507(1) provides that

> [i]f it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred, the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of

this Part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten percent (10%) of the principal amount of the debt or the time price differential plus ten percent (10%) of the cash price.

The statute applies not only to situations involving the wrongful disposition of collateral but also to wrongful repossessions. *See Lee County Bank v. Winson*, 444 So.2d 459, 463 (Fla.Dist.Ct.App.1983); *Randolph v. Franklin Investment Co.*, 398 A.2d 340, 349 (D.C.App.1979); White & Summers § 27–18, at 622.

Tenn.Code Ann. § 47–9–507(1)'s remedies are not intended to be exclusive and, in fact, are cumulative to other remedies available to debtors under state law. Thus, for example, seeking the relief provided in the statute will not preclude seeking to bar a deficiency judgment if the secured party disposes of the collateral in a commercially unreasonable manner.[5] *Atlas Thrift Co. v. Horan*, 27 Cal.App.3d 999, 104 Cal.Rptr. 315, 321 (1972); *Christian v. First Nat'l Bank*, 531 S.W.2d 832, 843 (Tex.Civ.App. 1975).

The Uniform Commercial Code's drafters included the statutory penalty for consumer goods in Section 9–507(1) because they believed that compensatory damages would not be a sufficient deterrent in the average consumer case. *See* White & Summers § 27–18, at 623. They intended that the statute would provide the minimum recovery for consumers who prove that a secured party did not proceed in accordance with the Uniform Commercial Code. *See* 9 R. Anderson, *Anderson on the Uniform Commercial Code* § 9–507:21 (1985).

■ In cases involving consumer goods, debtors are entitled to recover the statutory penalty without regard to their actual loss or their ability to prove that they have been damaged at all. *Gulf Homes, Inc. v. Goubeaux*, 136 Ariz. 33, 664 P.2d 183, 186 (1983); *First Nat'l Bank v.*

---

**5.** A secured party who disposes of collateral in a commercially unreasonable manner runs the risk of losing any deficiency judgment it might obtain because of the rebuttable presumption that the value of the collateral equals the amount of the debt. *Investors Acceptance of Livingston, Inc. v. James Talcott, Inc.*, 61 Tenn. App. 307, 330, 454 S.W.2d 130, 141 (1969).

*DiDomenico,* 302 Md. 290, 487 A.2d 646, 650 (1985); *Erdmann v. Rants,* 442 N.W.2d 441, 443 n. 1 (N.D.1989); *First City Bank v. Guex,* 677 S.W.2d 25, 29 (Texas 1984). Thus, other than proof that the secured party's conduct was inconsistent with the Uniform Commercial Code, the debtor need only prove the terms of the transaction. *See* 9 R. Anderson. *Anderson on the Uniform Commercial Code* § 9–507:11 (1985).

We have no reported cases in Tennessee dealing with the imposition of Tenn.Code Ann. § 47–9–507(1)'s minimum penalties. However, this court has, in at least three unreported cases, recognized that the remedy is available to debtors who prove that the secured party's conduct was contrary to the Uniform Commercial Code. *Edington v. City & County Bank,* C.A. No. 44, 4 U.C.C. Rep.Serv.2d (Callaghan) 1289, 1294, 1987 WL 12393 (Tenn.Ct.App. June 18, 1987); *Bob Bales Ford, Inc. v. Martin,* Hamblin Circuit, 31 U.C.C. Rep.Serv. (Callaghan) 789, 793 (Tenn.Ct.App. Feb. 4, 1981); *Provident Employees Credit Union v. Austin,* Hamilton Law, 31 U.C.C. Rep.Serv. (Callaghan) 786, 788 (Tenn.Ct. App. Feb. 4, 1981).

### C.

 The Davenports have never challenged the commercial reasonableness of Chrysler Credit's disposition of their automobile, and we have already concurred with the trial court's finding that Chrysler Credit was justified in repossessing the automobile and accelerating the debt because the Davenports were in default. Accordingly, the Davenports are only entitled to recover their damages stemming directly from the manner in which American Lender Service repossessed their automobile.

The Davenports' only proof concerning these damages is a broken lock and minor, cosmetic damage to their driveway. They are not entitled to recover for damage to their credit reputation because Chrysler Credit did not wrongfully accelerate their debt and because the proof showed that they had other credit problems. Thus, the Davenports are entitled to recover only Tenn.Code Ann. § 47–9–507(1)'s minimum penalty.

 For similar reasons, we have determined that Chrysler Credit should not forfeit its deficiency judgment. It did not act improperly by determining that the Davenports were in default, and its disposition of the automobile has not been challenged. Thus, as in cases involving the wrongful disposition of collateral,[6] the Davenports are entitled to set off the deficiency judgment by the amount of their Tenn. Code Ann. § 47–9–507(1) damages. The record contains sufficient proof to enable us to calculate the parties' damages. Thus, we need not require the parties or the trial court to go to the time and expense of doing so on remand.

The calculation of the Davenports' Tenn. Code Ann. § 47–9–507(1) damages should be based on the original amount of the debt. *See* White & Summers § 27–18, at 623. The retail installment contract states that the Davenports financed $15,243.65 and that the total finance charges were $5,203.15. Accordingly, the Davenports' Tenn.Code Ann. § 47–9–507(1) damages were $6,728.[7] Chrysler Credit's deficiency after the sale of the Davenports' automobile was $6,774. Granting the Davenports a $6,728 credit against the deficiency, Chrysler Credit is entitled to a $46 judgment against the Davenports.

### D.

The final issue concerns the Davenports' request for punitive damages. We have determined that the Davenports are not entitled to punitive damages under the facts of this case.

 A party is entitled to punitive damages only if it recovers actual damages,

---

6. *See Investors Acceptance Co. of Livingston, Inc. v. James Talcott, Inc.,* 61 Tenn.App. 307, 329–30, 454 S.W.2d 130, 141 (1969); *Mallicoat v. Volunteer Fin. & Loan Co.,* 57 Tenn.App. 106, 115, 415 S.W.2d 347, 351–52 (1966).

7. $5,203.15 (credit service charge) + $1,524.37 (10% of $15,243.65) = $6,727.52.

*Liberty Mut. Ins. Co. v. Stevenson,* 212 Tenn. 178, 180, 368 S.W.2d 760, 761 (1963); *Solomon v. First Am. Nat'l Bank,* 774 S.W.2d 935, 943 (Tenn.Ct.App.1989), and if the defendant's conduct amounts to fraud, malice, oppression, gross negligence, or outrageous conduct. *Moorehead v. J.C. Penney,* 555 S.W.2d 713, 718 (Tenn.1977); *Inland Container Corp. v. March,* 529 S.W.2d 43, 44–45 (Tenn.1975); *Bland v. Smith,* 197 Tenn. 683, 687, 277 S.W.2d 377, 379 (1955).

The Davenports have not proved that they were actually damaged by the manner in which their automobile was repossessed. Chrysler Credit's and American Lender Service's actions in this case did not amount to outrageous conduct, fraud, or oppression, especially in light of the tolerant standard contained in *Harris Truck & Trailer Sales v. Foote.*

Like Tenn.Code Ann. § 47–9–507(1)'s minimum penalty, punitive damages are intended to serve as a financial penalty to deter similar acts in the future. *Huckeby v. Spangler,* 563 S.W.2d 555, 558–59 (Tenn.1978). We need not penalize Chrysler Credit twice. Since we have already imposed the statutory minimum penalty, we need not assess punitive damages as well.

## V.

We reverse the trial court's judgment dismissing the Davenports' complaint and remand the case for the entry of an order consistent with this opinion. We tax the costs in equal proportions against the Davenports and Chrysler Credit Corporation, and their respective sureties, for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.